BOARD OF EDUCATION OF THE CINCINNATI SCHOOL DISTRICT, APPELLANT, *v.* HAMILTON CTY. BD. OF REVISION; MIRGE CORPORATION, APPELLEE.

[Cite as *Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision* (2001), 91 Ohio St.3d 308.]

(No. 00–692—Submitted November 28, 2000—Decided April 11, 2001.)

MOYER, C.J. In 1998, subsequent to our decision in *Sharon Village Ltd. v. Licking Cty. Bd. of Revision* (1997), 78 Ohio St.3d 479, 678 N.E.2d 932, the General Assembly enacted Sub.H.B. No. 694, effective March 30, 1999, 147 Ohio Laws, Part III, 5373. The bill became law without the signature of the Governor. *Id.* at 5378. The preamble to the legislation characterized its purpose to be "to amend sections 5715.13[1] and 5715.19 of the Revised Code to clarify who may file a complaint [challenging real property valuation assessments] with a county board of revision." *Id.* at 5373. The amended statutes permit the filing of a complaint by a person owning taxable property and also by certain persons who are not lawyers.[2] As relevant herein, amended R.C. 5715.19 authorizes corporate officers to file valuation complaints on behalf of their corporation.

---

1. R.C. 5715.13, as amended by Sub.H.B. No. 694, provides:
 "The county board of revision shall not decrease any valuation unless a party affected thereby or who is authorized to file a complaint under section 5715.19 of the Revised Code makes and files with the board a written application therefor, verified by oath, showing the facts upon which it is claimed such decrease should be made."

2. R.C. 5715.19(A)(1), as amended by Sub.H.B. No. 694, authorizes the following nonlawyers to file tax reduction complaints on behalf of real property owners: "an individual who is retained by [the

The syllabus to *Sharon Village* provides, "The preparation and filing of a complaint with a board of revision on behalf of a taxpayer constitute the practice of law." *Sharon Village* reaffirmed existing precedent that the filing of a verified complaint pursuant to R.C. 5715.13 and 5715.19 is requisite to the vesting of jurisdiction in a board of revision, and failure to fully and properly complete the complaint justifies dismissal of the action. *Id.,* 78 Ohio St.3d at 481, 678 N.E.2d at 934, citing *Stanjim Co. v. Mahoning Cty. Bd. of Revision* (1974), 38 Ohio St.2d 233, 67 O.O.2d 296, 313 N.E.2d 14. In *Sharon Village* we affirmed the dismissal, for lack of jurisdiction, of a valuation complaint prepared and filed on behalf of a corporation by a nonattorney, who was thereby engaging in the unauthorized practice of law.

Sub.H.B. No. 694 also created an exception to the general rule set forth in R.C. 5715.19(A)(2)[3] that a real property taxpayer is, in the absence of a showing of a change in circumstances, prohibited from filing successive valuation complaints in the same triennium. See *Elkem Metals Co., L.P. v. Washington Cty. Bd. of Revision* (1998), 81 Ohio St.3d 683, 693 N.E.2d 276. This exception provides that "[i]f a county board of revision, the board of tax appeals, or any court dismisses a complaint filed under [section 5715.19] or section 5715.13 of the Revised Code for

---

owner or the owner's spouse] and who holds a designation from a professional assessment organization, such as the institute for professionals in taxation, the national council of property taxation, or the international association of assessing officers, a public accountant who holds a permit under section 4701.10 of the Revised Code, a general or residential real estate appraiser licensed or certified under Chapter 4763. of the Revised Code, or a real estate broker licensed under Chapter 4735. of the Revised Code, who is retained by such a person; if the person is a firm, company, association, partnership, limited liability company, or corporation, an officer, a salaried employee, a partner, or a member of that person; if the person is a trust, a trustee of the trust." 147 Ohio Laws, Part III, 5373–5374.

3. R.C. 5715.19(A)(2) provides, just as it did before the enactment of Sub.H.B. No. 694, as follows:
"As used in division (A)(2) of this section, 'interim period' means, for each county, the tax year to which section 5715.24 of the Revised Code applies and each subsequent tax year until the tax year in which that section applies again.
"No person, board, or officer shall file a complaint against the valuation or assessment of any parcel that appears on the tax list if it filed a complaint against the valuation or assessment of that parcel for any prior tax year in the same interim period, unless the person, board, or officer alleges that the valuation or assessment should be changed due to one or more of the following circumstances that occurred after the tax lien date for the tax year for which the prior complaint was filed and that the circumstances were not taken into consideration with respect to the prior complaint:
"(a) The property was sold in an arm's length transaction, as described in section 5713.03 of the Revised Code;
"(b) The property lost value due to some casualty;
"(c) Substantial improvement was added to the property;
"(d) An increase or decrease of at least fifteen percent in the property's occupancy has had a substantial economic impact on the property."

the reason that the act of filing the complaint was the unauthorized practice of law or the person filing the complaint was engaged in the unauthorized practice of law, the party affected by a decrease in valuation or the party's agent, or the person owning taxable real property in the county or in a taxing district with territory in the county, may refile the complaint, notwithstanding division (A)(2) of this section." R.C. 5715.19(A)(3), 147 Ohio Laws, Part III, 5374–5375.

In addition, Sub.H.B. No. 694 included the following uncodified language in Section 3 of the Act:

"The amendment by this act of sections 5715.13 and 5715.19 of the Revised Code is remedial legislation and applies to any complaint that was timely filed under either of these sections respecting valuations for tax year 1996 or 1997, and to complaints filed for tax years 1998 and thereafter. Notwithstanding division (A)(2) of section 5715.19 of the Revised Code, any person authorized by this act to file a complaint under section 5715.13 or 5715.19 of the Revised Code that timely filed a complaint for tax year 1996 or 1997 may file a complaint under those sections, as amended by this act, on or before March 31, 1999, respecting valuations for tax year 1996, 1997, or 1998, and the board of revision shall proceed to hear the complaint as otherwise provided under Chapter 5715. of the Revised Code."[4] 147 Ohio Laws, Part III, 5378.

This court considered a valuation complaint filed prior to the effective date of Sub.H.B. No. 694 by appellant herein, Mirge Corporation, d.b.a. Electrical Mechanics ("Mirge"), in *Worthington City School Dist. Bd. of Edn. v. Franklin Cty. Bd. of Revision* (1999), 85 Ohio St.3d 156, 707 N.E.2d 499.[5] That complaint had been prepared, signed and filed on behalf of the corporation by Mirge's vice president, rather than an attorney, and challenged the assessed value of the corporation's property located at 2570 Gobel Court in Cincinnati for tax year 1996. In finding that the complaint failed to vest jurisdiction in the board of revision, we reaffirmed our prior holding that a " 'corporation cannot maintain litigation *in propria persona*, or appear in court through an officer of the corporation or an appointed agent not admitted to the practice of law.' " *Id.* at 160, 707 N.E.2d at 502, quoting *Union Savings Assn. v. Home Owners Aid, Inc.* (1970), 23 Ohio St.2d 60, 52 O.O.2d 329, 262 N.E.2d 558, syllabus.

---

4. Subsequently, Sections 149 and 150 of Am.Sub.H.B. No. 283 authorized refiling of complaints relative to tax years 1994 and 1995 as well, and extended the deadline for refiling until March 31, 2000.

5. The opinion cited as *Worthington City School Dist. Bd. of Edn. v. Franklin Cty. Bd. of Revision* (1999), 85 Ohio St.3d 156, 707 N.E.2d 499, in fact resolved four cases consolidated by this court, including *Mirge Corp. v. Hamilton Cty. Bd. of Revision* (1998), case No. 97–2423, 82 Ohio St.3d 1437, 694 N.E.2d 1374.

On March 30, 1999, Mirge filed a new complaint, the subject of this appeal, with the Hamilton County Board of Revision, as authorized by Sub.H.B. No. 694. This was, in effect, a refiling of the complaint at issue in *Worthington City School Dist. v. Franklin Cty. Bd. of Revision, supra.* The complaint again contested the assessed value of its real property at 2570 Gobel Court in Cincinnati for tax year 1996.

Mirge asserted that the property's taxable value should be reduced from $227,920 to $47,575. It contended that the lowered valuation corresponded to the actual sales price of the property when Mirge acquired it on August 8, 1995. The 1999 Mirge complaint, which was executed on a printed form, listed attorney Franklin A. Klaine, Jr., as agent for Mirge. Klaine also signed the bottom of the complaint form as "Franklin A. Klaine, Jr., Attorney for Mirge Corp." In addition, the 1999 complaint bore the sworn signature of Walter Higginbothan, vice president of Mirge, who signed as "complainant or agent," indicating his declaration under penalty of perjury that the complaint had been examined by him and was true, correct, and complete to the best of his knowledge and belief. A notary public, separate from attorney Klaine, notarized Higginbothan's declaration.

Thereafter a countercomplaint was filed by the Board of Education of the Cincinnati School District ("board of education"), appellant herein, asserting that the auditor's taxable value of $227,920 for the property was correct based on a fair market value of the property of $651,200 rather than $135,900 as asserted by Mirge.

The board of revision held a hearing on July 6, 1999, at which attorney Klaine appeared on behalf of Mirge. The board considered the hearing as involving not only the 1999 complaint as to tax year 1996 but also subsequent tax years 1997, the complaint for which had been dismissed, and 1998. Thus, the hearing sought to determine the taxable values for the Mirge property for all three tax years, 1996 through 1998.

At the hearing, Higginbothan testified that he had prepared the 1999 complaint relating to the 1996 tax year valuation, and Klaine represented that his office had filed the complaint. Higginbothan further testified that on July 28, 1995, Mirge purchased the subject property for $135,900.

The board of revision granted the reduction as requested by Mirge, effective for tax years 1996, 1997, and 1998, setting the fair market value of the parcel at $135,900, its 1995 purchase price. The board of education appealed to the Board of Tax Appeals. The parties stipulated that the appeals for tax years 1996, 1997, and 1998 filed by the board of education should be consolidated.

The Board of Tax Appeals found no procedural obstacle to its jurisdiction pursuant to *Sharon Village* and its progeny, in that attorney Klaine had reviewed

and signed the complaint, filed it, and had appeared as counsel of record in the legal proceedings which ensued. It further found that the evidence supported the determinations of value made by the board of revision for each of the three years in question. It therefore ordered the Auditor of Hamilton County to value the property at a fair market value of $135,900 ($47,560 tax value).

The cause is now before this court upon an appeal as of right.

This appeal presents two issues for our resolution. The first is jurisdictional and questions whether the Board of Tax Appeals should have dismissed the appeal, pursuant to *Sharon Village* and its progeny, *i.e., Lakeside Ave. L.P. v. Cuyahoga Cty. Bd. of Revision* (1999), 85 Ohio St.3d 125, 707 N.E.2d 472; *Worthington City School Dist. Bd. of Edn. v. Franklin Cty. Bd. of Revision,* 85 Ohio St.3d 156, 707 N.E.2d 499; *Fravel v. Stark Cty. Bd. of Revision* (2000), 88 Ohio St.3d 574, 728 N.E.2d 393; *C.I.A. Properties v. Cuyahoga Cty. Aud.* (2000), 89 Ohio St.3d 363, 731 N.E.2d 680, because a nonattorney had prepared the complaint filed on behalf of corporate taxpayer Mirage. We affirm the finding of the Board of Tax Appeals that the precedent set forth in *Sharon Village* does not mandate dismissal of the case now before us.

The second issue is whether Sub.H.B. No. 694 is valid insofar as it purports to permit a taxpayer to file a second complaint for tax years 1996 and 1997 when previous complaints for those tax years had been dismissed pursuant to *Sharon Village.* We reverse the order of the board on this issue because application of this portion of Sub.H.B. No. 694, authorizing the refiling of dismissed complaints challenging valuations for tax years prior to the effective date of Sub.H.B. No. 694, violates Section 28, Article II of the Ohio Constitution, which prohibits the enactment of retroactive legislation.

I

*Jurisdictional Issue*

The facts in *Sharon Village* are distinguishable from the facts in the case at bar. In *Sharon Village,* a nonattorney both prepared *and* filed complaints in the board of revision without the involvement of, or supervision by, a licensed attorney. In addition to preparing legal documents, the nonattorney also gave professional advice and appeared before a board of revision on behalf of corporate clients. He acted in his capacity as president of an entity known as Ambassador Research, Inc. We held that the nonattorney had engaged in the unauthorized practice of law and, accordingly, that jurisdiction had never vested in the board of revision upon the preparation and filing of a valuation complaint by him.

The Board of Tax Appeals found in the instant case that "one of Mirge's corporate officers prepared the subject complaint. It was then submitted to an

attorney licensed to practice in Ohio, who reviewed the complaint, executed the complaint with his signature, and thereafter filed the complaint with the county auditor for presentation to the Board of Revision * * *, represented Mirge before the Board of Revision," and appeared before the Board of Tax Appeals. These findings of fact are directly supported by the record or are factual inferences that can be reasonably drawn from evidence in the record.

In the case at bar, the nonattorney did not prepare and file the complaint as had the nonattorney in *Sharon Village*. Rather, he drafted and verified the factual allegations it contained. He then transmitted it to attorney Klaine for review and filing. Klaine, not Higginbothan, initiated the proceedings by filing, or directing the filing, of a valid complaint so as to vest jurisdiction in the board of revision. Thereafter Mirge was represented throughout these proceedings by attorney Klaine.

Preparation of a complaint, unaccompanied by filing, does not fit within the express language of the syllabus to *Sharon Village*, which reads, "The preparation and filing of a complaint with a board of revision on behalf of a taxpayer constitute the practice of law." Were either preparation alone or filing alone sufficient to constitute the practice of law for purposes of determining the validity of a valuation complaint, the syllabus would have read, "The preparation *or* filing of a complaint with a board of revision on behalf of a taxpayer constitutes the practice of law."

In any event, the critical inquiry for purposes of determining the vesting of jurisdiction in a board of revision is whether the record demonstrates the initiation of proceedings by the filing of a jurisdictionally valid complaint, *i.e.*, a complaint "prepared and filed" either by the taxpayer acting in a *pro se* capacity or by an attorney authorized to practice law acting in the taxpayer's behalf. See *C.I.A. Properties*, 89 Ohio St.3d at 365, 731 N.E.2d at 683.

Higginbothan conceded that he had drafted and verified the real property assessment complaint before forwarding it to legal counsel. When Klaine signed the complaint in the form "Franklin A. Klaine, Jr., Attorney for Mirge Corp.," he indicated his assent to the characterization found within it that he was Mirge's representative, irrespective of the identity of the person or persons who had prepared the document. Cf. Civ.R. 11 ("The signature of an attorney * * * constitutes a certificate by the attorney * * * that the attorney * * * has read the document; that to the best of the attorney's * * * knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay"). When an attorney affixes his or her signature to such a complaint in his or her capacity as an attorney and directs that it be filed, that attorney thereby indicates his or her undertaking of legal representation of the taxpayer.

Accordingly, it was Klaine, rather than Higginbothan, who initiated the board of revision proceedings by "preparing and filing" the complaint.

Moreover, as observed by the Board of Tax Appeals, it is commonplace for nonattorneys to assist in the drafting of complaints and in providing factual information for inclusion in complaints. Ultimately, however, the attorney ratifies and assumes responsibility for a complaint by signing and filing it, whether or not he acted as its scrivener.

We therefore hold that an attorney who signs an R.C. 5715.19 valuation complaint in his or her capacity as an attorney-at-law and files it, or directs its filing, in accord with R.C. Chapter 5715, has thereby "prepared and filed" that complaint for purposes of determining whether jurisdiction has vested in a county board of revision, as contemplated by *Sharon Village Ltd. v. Licking Cty. Bd. of Revision* (1997), 78 Ohio St.3d 479, 678 N.E.2d 932.

The board of revision and the Board of Tax Appeals did not err in finding that jurisdiction had vested in the board of revision as a result of the filing of the 1999 complaint by, or at the direction of, attorney Klaine, who had signed the complaint, even though it may have been drafted and verified before a notary public by nonattorney Higginbothan. It is therefore unnecessary for us to consider the constitutionality of that part of R.C. 5715.19 that purports to empower certain nonattorneys, including corporate officers, to file valuation complaints on behalf of others.

## II

### *Retroactivity Issue*

The board of education contends that application of Sub.H.B. No. 694 so as to allow Mirge to file a second challenge to the valuation of its property for tax year 1996 violates Section 28, Article II of the Ohio Constitution. That constitutional provision states that "[t]he general assembly shall have no power to pass retroactive laws." Mirge argues that Sub.H.B. No. 694 cured a defect in a prior statute and was, thus, a remedial statute that could be applied retroactively.

We recently interpreted Section 28, Article II of the Ohio Constitution, stating that "[t]he retroactivity clause nullifies those new laws that 'reach back and create new burdens, new duties, new obligations, or new liabilities not existing at the time [the statute becomes effective].'" *Bielat v. Bielat* (2000), 87 Ohio St.3d 350, 352–353, 721 N.E.2d 28, 32, quoting *Miller v. Hixson* (1901), 64 Ohio St. 39, 51, 59 N.E. 749, 752. We further distinguished between constitutional and unconstitutional retroactivity, and set forth a two-prong test to determine unconstitutional retroactivity. First, the court must "determine whether the General Assembly expressly intended the statute to apply retroactively," *Bielat* at 353,

721 N.E.2d at 33, citing R.C. 1.48. "If so, the court moves on to the question of whether the statute is substantive, rendering it *unconstitutionally* retroactive, as opposed to merely remedial [*i.e.,* constitutionally retroactive]." (Emphasis *sic.*) *Id.*

Permissively retroactive, remedial laws are laws that "merely substitute a new or more appropriate remedy for the enforcement of an existing right." *State v. Cook* (1998), 83 Ohio St.3d 404, 411, 700 N.E.2d 570, 577. "On the other hand, a retroactive statute is substantive—and therefore *unconstitutionally* retroactive— if it impairs vested rights, affects an accrued substantive right, or imposes new or additional burdens, duties, obligations, or liabilities as to a past transaction." *Bielat, supra,* at 87 Ohio St.3d at 354, 721 N.E.2d at 33.

The *Bielat* court thereby recognized that a statute that retroactively creates a new right is unconstitutionally retroactive if, and only if, it also impairs a vested right or creates some new obligation or burden as well:

"A claim for substantive retroactivity cannot be based solely upon evidence that a statute retrospectively created a new right, but must also include a showing of some impairment, burden, deprivation, or new obligation accompanying that new right." *Bielat,* paragraph two of the syllabus.

The *Bielat* opinion cited *State ex rel. Crotty v. Zangerle* (1938), 133 Ohio St. 532, 11 O.O. 226, 14 N.E.2d 932, in which the court nullified a statute that allowed for the refunding of tax penalties legally paid in prior years. Quoting extensively from *Hamilton Cty. Commrs. v. Rosche Bros.* (1893), 50 Ohio St. 103, 33 N.E. 408, the *Crotty* court concluded that the statute created a new right by providing a new legal avenue to recover penalties, but that it was unconstitutionally retroactive because it imposed an obligation on the county officials to refund taxes " 'that did not attach to the transaction when it occurred.' " *Crotty,* 133 Ohio St. at 536, 11 O.O. at 228, 14 N.E.2d at 934, quoting Rosche, 50 Ohio St. at 113, 33 N.E. at 410.

Here, Sub.H.B. No. 694 similarly purports to create a new right in property owners to refile dismissed complaints under new substantive rules governing the vesting of jurisdiction in a board of revision to reduce real property assessments and creates a new right to file successive valuation complaints in the same triennium under particular circumstances. While the General Assembly may have the right to accomplish such changes, assuming they are otherwise constitutional, the General Assembly may not do so retroactively, as such changes bring with them new burdens and therefore are not merely remedial. The county officials who opposed reduction in assessed valuations when the first complaints were dismissed could have concluded that those dismissals, followed by exhaustion of judicial review, ended the valuation proceedings and established the value of the property for the triennium period, thereby creating a "reasonable expecta-

tion of finality." Cf. *State ex rel. Matz v. Brown* (1988), 37 Ohio St.3d 279, 281, 525 N.E.2d 805, 808. But Sub.H.B. No. 694 imposes on those officials a burden to again defend the value determined by the auditor and, potentially, to refund taxes if the complainant is successful. Under *Bielat* and *Crotty*, Sub.H.B. No. 694 is unconstitutionally retroactive because it creates a new right while, at the same time, imposing a new burden on parties who had appeared in opposition to the merits of once-dismissed valuation complaints or countercomplaints.

We therefore hold that R.C. 5715.19 as amended by Sub.H.B. No. 694 may not be constitutionally applied to permit the refiling of once-dismissed R.C. 5715.19 complaints challenging valuations for tax years prior to the effective date of Sub.H.B. No. 694 (March 30, 1999). Such an application violates Section 28, Article II of the Ohio Constitution, which prohibits the enactment of retroactive legislation.

Accordingly, we reverse the decision of the Board of Tax Appeals and remand the cause with instructions that the valuation of appellant's property for tax years 1996, 1997, and 1998 be set at $227,920, as originally assessed by the auditor.

*Decision reversed*
*and cause remanded.*

DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK, J., concurs in paragraph one of the syllabus and in the judgment.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

———————

LUNDBERG STRATTON, J., concurring in part and dissenting in part. I concur with the majority's conclusion that the attorney's signature on the complaint was sufficient to vest jurisdiction in a county board of revision. However, I respectfully dissent from the determination that amended R.C. 5715.19, as applied to a refiled complaint challenging tax valuations for years prior to the effective date of the bill, is unconstitutional.

Because of *Sharon Village Ltd. v. Licking Cty. Bd. of Revision* (1997), 78 Ohio St.3d 479, 678 N.E.2d 932, and its progeny, many taxpayers who filed otherwise meritorious complaints within the triennium were foreclosed from the opportunity to challenge a tax valuation. Until *Sharon Village*, the accepted practice permitted corporate officers or agents to file on behalf of their corporation or agency. Consequently, the General Assembly enacted curative legislation that provided for a specific exception that would apply beginning with tax year 1996 and thereafter to afford those taxpayers the opportunity to cure the defect that resulted in dismissal of their original complaint. See Ohio Laws, Part III, 5378.

R.C. 5715.19 was intended, and does, provide a remedy for those taxpayers whose complaint was dismissed merely because of a very specific jurisdictional defect. Therefore, R.C. 5715.19 is curative in nature. It affects the procedure by which a taxpayer's rights are recognized, protected, and enforced. See *Weil v. Taxicabs of Cincinnati, Inc.* (1942), 139 Ohio St. 198, 205, 22 O.O. 205, 208, 39 N.E.2d 148, 151.

I do not agree with the majority that the statute creates a new right to file successive complaints in the same triennium under certain circumstances. I believe it is more accurate to state that the statute allows the taxpayer whose initial complaint was defective to refile a proper and complete complaint within the triennium and to correct a mistake so that an already existing right is not lost. This is not substantive, but rather remedial.

Nor do I believe that application of R.C. 5715.19 creates a burden on defending parties. The majority reasons that Sub.H.B. No. 694 imposes a new burden on parties who had opposed the initial, now-dismissed complaint on the merits to once again defend the value determined by the auditor. If the initial valuation complaint was dismissed at the inception for lack of jurisdiction, it is quite likely that the parties did not reach the merits of the case. Even so, I do not consider a "reasonable expectation of finality" of litigation to be a vested substantive right sufficient to strike down an otherwise valid constitutional enactment. We should weigh that expectation against the rights of those who followed established and accepted practices yet were stripped of the right to challenge an auditor's tax valuation by our interpretation in *Sharon Village*. They also have an expectation to have their case considered on the merits. Therefore, I must respectfully dissent.

---

*Wood & Lamping, L.L.P.*, and *David C. DiMuzio*, for appellant.

*Strauss & Troy* and *Franklin A. Klaine, Jr.*, for appellee Mirge, Inc.

MANNION ET AL., APPELLANTS, *v.* SANDEL, APPELLEE.

[Cite as *Mannion v. Sandel* (2001), 91 Ohio St.3d 318.]

(No. 00–903—Submitted February 7, 2001—Decided April 11, 2001.)

ALICE ROBIE RESNICK, J. This case involves a trial court's decision in a medical malpractice action to grant a motion for a new trial after the jury had rendered a verdict in favor of one of the parties. The particular issue that arises in the circumstances before us concerns the standard of specificity that the trial court must meet as that court articulates the reasons behind the determination that a new trial is warranted on the ground that the verdict is against the manifest weight of the evidence.

I

Facts and Procedural History

This case is a medical malpractice action for damages brought by plaintiff-appellant Michelle L. Mannion and includes a loss-of-consortium claim of her husband, plaintiff-appellant Thomas Mannion. The defendant is appellee, Allan J. Sandel, M.D. Appellants' complaint against Sandel was filed on October 9, 1996, in the Summit County Court of Common Pleas. The case proceeded to jury trial on November 10, 1997.

The testimony presented at trial established that Mrs. Mannion was diagnosed with breast fibroadenomas and benign tumors in 1988. On January 17, 1989, appellee performed a bilateral mastectomy and subcutaneously placed polyurethane-foam-covered breast implants. Subsequently, appellant experienced infection, pain, and drainage to the left breast, and the left nipple sloughed off, exposing the implant. Appellee performed a second surgery to remove appellant's infected left breast implant. On July 18, 1989, appellee again performed surgery to subcutaneously reinsert a new polyurethane-foam-covered left breast implant. Within a few months, appellant's left breast implant developed an open lesion, resulting in drainage, infection, and pain, and warranting emergency room visits. On September 20, 1990, appellant was admitted to the hospital and administered intravenous antibiotics, which were ineffective. Appellee again performed surgery to remove the implant.

From 1990 to 1993, the wound on appellant's left breast failed to heal, resulting in pieces of polyurethane foam coming to the surface and emerging through the lesion. Appellee contended that there was no reason to remove the remaining

polyurethane foam from the left breast implant, since it was working its way out on its own.

Appellant continued to experience difficulties with the breast implant, and in August 1993, she went to see Zaheer Shah, M.D. Shah told her that both the right implant and the residual polyurethane foam on the left side needed to be removed immediately. The right breast implant and residual polyurethane foam from the left breast area were removed by Shah, leaving appellant with no implants and virtually no breast tissue.

Appellants' expert witness, Dr. Philip Lipkin, testified that the standard of care required submuscular rather than subcutaneous implants for appellant. He further testified that this submuscular procedure had been in place since the early 1980s because of concern about compromised blood supply to the skin. Lipkin opined that appellee's decision to use subcutaneous placement rather than submuscular was not up to the standard of care in 1989. Moreover, Lipkin testified as to the standard of care involved in removing a polyurethane-coated implant. He further testified that due to appellee's use of subcutaneous placement (as opposed to submuscular implantation), appellant suffered skin loss, infection, and implant exposure, which ultimately required total removal of the implants.

Appellee's expert, Dr. Brian Windell, similarly testified that the standard of care that existed in 1989 would have required appellee to attempt to remove all of the polyurethane foam fragments during the removal of the infected implant.

After the jury returned a verdict in favor of appellee, appellants filed a motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The trial court overruled the motion for judgment notwithstanding the verdict and granted the motion for a new trial under Civ.R. 59(A)(6), finding that the judgment was not sustained by the weight of the evidence. Appellee appealed the granting of the motion for a new trial to the Ninth District Court of Appeals, which, in a two-to-one decision, reversed the order of the trial court.

This cause is now before this court pursuant to the allowance of a discretionary appeal.

## II

### Specificity Pursuant to Civ.R. 59(A)

Civ.R. 59(A) provides:

"A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

" * * *

"(6) The judgment is not sustained by the weight of the evidence * * *."

Civ.R. 59(A) goes on to provide that "[w]hen a new trial is granted, the court shall specify in writing the grounds upon which such new trial is granted."

The order granting the new trial at issue in this case provided:

"The Court has reviewed the testimony of the experts who appeared at the trial of this matter. The Plaintiff[s'] and Defendant's experts testified that certain of the Defendant's conduct violated the standard of care. Both doctors testified that by failing to remove the polyurethane foam coating of Plaintiff's left breast implant upon removal of the implant, the Defendant violated the standard of care as it existed at the time.

"Therefore, there is evidence that, on at least one of Plaintiff[s'] claims regarding the negligent removal of Plaintiff's left implant, the jury should have found that the Defendant did not meet the standard of care. In order to correct a manifest injustice, the Plaintiff[s'] Motion for a New Trial is granted."

The issue before this court is whether the order of the trial court in granting the motion for a new trial complied with Civ.R. 59(A) as the rule was interpreted by this court in *Antal v. Olde Worlde Products, Inc.* (1984), 9 Ohio St.3d 144, 9 OBR 392, 459 N.E.2d 223.

In assessing the propriety of the trial court's compliance, we are guided by *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraph one of the syllabus:

"Where a trial court is authorized to grant a new trial for a reason which requires the exercise of a sound discretion, the order granting a new trial may be reversed only upon a showing of abuse of discretion by the trial court."

In *Antal*, 9 Ohio St.3d at 147, 9 OBR at 395, 459 N.E.2d at 226–227, the court stated:

"The question remains as to how specific must a trial court be when granting a new trial on the ground that the verdict is against the manifest weight of the evidence. The record of the case at bar reveals that the trial court articulated no reasons whatsoever, other than stating generally that the jury's verdict was not 'sustained by the weight of the evidence.' While the determination of whether a trial court's statement of reasons is sufficient should be left to a case-by-case analysis, we can say with a reasonable degree of certainty that such reasons will be deemed insufficient if simply couched in the form of conclusions or statements of ultimate fact. [Citation omitted.]

"Consequently, we hold that, when granting a motion for a new trial based on the contention that the verdict is not sustained by the weight of the evidence, the trial court must articulate the reasons for so doing in order to allow a reviewing

court to determine whether the trial court abused its discretion in ordering a new trial." See *id.* at syllabus.

In its entry the trial court stated that both experts "testified that by failing to remove the polyurethane foam coating of Plaintiff's left breast implant upon removal of the implant, the Defendant violated the standard of care as it existed at the time." The foregoing language of the trial court cannot be construed as being "simply couched in the form of conclusions or statements of ultimate fact," as was found inadequate in *Antal.* There can be no hard-and-fast rule set forth by this court as to sufficiency of the grounds specified by a trial court in support of the determination that a new trial is warranted. We adhere to the necessity of case-by-case determinations as set forth in *Antal.*

The majority of the court of appeals stated in the opinion below that it was appropriate to apply a more stringent standard when dealing with the setting aside of a jury verdict as against the weight of the evidence than for other new trial orders under Civ.R. 59(A). However, courts of appeals are required to follow the law as it is interpreted by this court. We decline to extend the rule of *Antal* to require a more stringent standard of specificity in setting forth reasons for granting a new trial in a situation such as the case *sub judice.*

The trial court decision to grant a new trial in this case is subject to the same abuse-of-discretion standard discussed in *Antal.* "[A] reviewing court should view the evidence favorably to the trial court's action rather than to the jury's verdict. The predicate for that rule springs, in part, from the principle that the discretion of the trial judge in granting a new trial may be supported by his having determined from the surrounding circumstances and atmosphere of the trial that the jury's verdict resulted in manifest injustice." *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 320, 21 O.O.3d 198, 202, 423 N.E.2d 856, 860.

It is not the place of this court to weigh the evidence in these cases. In reviewing the order of the trial court, we first find that sufficiently detailed reasoning was specified in writing to allow an appellate court to conduct a meaningful review to determine whether the trial court abused its discretion in ordering a new trial.

Furthermore, after a thorough review of the record, we find that there has been no showing that the trial court's order was unreasonable, arbitrary, or unconscionable. See *Rohde,* 23 Ohio St.2d at 87, 52 O.O.2d at 378–379, 262 N.E.2d at 689; *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855, paragraph two of the syllabus. Therefore, we find no abuse of discretion.

### III

### Conclusion

The trial court's order articulated reasons for granting a new trial sufficient for appellate review in accordance with the requirements of Civ.R. 59(A) and of

*Antal.* In addition, the trial court's order did not constitute an abuse of discretion. We reverse the judgment of the court of appeals and remand this cause to the trial court for a new trial on all counts.

*Judgment reversed
and cause remanded.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Chattman, Gaines & Stern, John V. Scharon, Jr., Dale A. Nowak* and *Michael B. Michelson,* for appellants.

*Gallagher, Sharp, Fulton & Norman, Lynn L. Moore* and *Marie L. Perella; Edminster & Associates* and *Michael E. Edminster,* for appellee.

---

CHARI, APPELLEE, *v.* VORE, SHERIFF, APPELLANT.

[Cite as *Chari v. Vore* (2001), 91 Ohio St.3d 323.]

(No. 00–926—Submitted January 30, 2001—Decided April 11, 2001.)

---

*Per Curiam.* On December 3, 1999, a Montgomery County Grand Jury returned an indictment charging appellee, Krishan Chari, with nineteen felony counts, including engaging in a pattern of corrupt activity, theft, and forgery. These charges reflect a loss of approximately $6,000,000 to Chari's alleged victims. The trial court ordered Chari released upon his posting of a bail bond of $500,000 secured by a ten percent deposit and his agreement to be placed under the supervision of the court's electronic home-detention program. Chari posted the required bond and was released from jail.

On March 31, 2000, a Montgomery County Grand Jury returned an indictment that superseded the December 3, 1999 indictment and charged Chari with forty felony counts, including the prior nineteen counts as well as four counts alleging criminal conduct by Chari that occurred while Chari had been released on bail

after the first indictment. On the same date, the Pretrial Services Department of the Montgomery County Court of Common Pleas recommended that Chari's bond be revoked and that a new bond be set in the amount of $1,000,000 without the ten percent security-deposit provision. The common pleas court adopted this recommendation and ordered Chari to post a bail bond of $1,000,000 and, upon his posting of this bond, to have Chari again placed in the electronic home-detention program.

Instead of posting the required bond, on April 6, 2000, Chari filed a petition in the Court of Appeals for Montgomery County for a writ of habeas corpus to compel his discharge from jail on reasonable bail. The petition was not verified. In his petition, Chari alleged that his imprisonment was "without lawful authority" because he was being held for $1,000,000 bail, "which sum he is unable to meet," and that "[t]his bail, which was fixed by the Montgomery County Common Pleas Court, is excessive, unlawful and in violation of Section 9, Article [I] of the Constitution of Ohio." No specific facts supporting his conclusory allegations of excessiveness, unlawfulness, and unconstitutionality were contained in his petition.

On April 12, despite Chari's failure to comply with the verification requirements of R.C. 2725.04 and his conclusory allegations, the court of appeals allowed the writ and ordered appellee, the Montgomery County Sheriff, to make a return on April 14. The court of appeals also ordered that on that scheduled hearing date, the sheriff "show cause why an order should not be entered granting the relief requested * * * in the Petition For Writ of Habeas Corpus."

On April 14, the sheriff filed a return that included the justification for Chari's incarceration, i.e., a copy of the common pleas court's March 31 $1,000,000 bond order. On that date, at the hearing, the court of appeals asserted that the state had "the burden to go forward * * * at this time." After the state briefly presented legal authority to the contrary, the court of appeals ruled that it would allocate the burden at the end of the hearing. Nevertheless, it advised the state to call the first witness. On this same date, the sheriff filed a motion to dismiss the petition because it was not verified. In response to the sheriff's dismissal motion, Chari filed an amended petition, which was identical to his earlier petition except that underneath one of his attorney's signatures was the notarized statement "Sworn to and subscribed in my presence by Louis I. Hoffman, Attorney for Krishan Chari." The amended petition, however, lacked words of verification that Chari or his attorneys expressly swore to the truth of the facts alleged in the petition. Chari, through counsel, asserted that he was uncertain whether verification was "legally required" and filed the amended petition "to avoid that distraction."

On April 17, the court of appeals determined that the $1,000,000 bail bond ordered by the common pleas court was excessive, granted the writ of habeas corpus, and modified the $1,000,000 bond so that it would be subject to the ten percent security-deposit provisions of Crim.R. 46(A)(2). Additionally, reasoning that petitioner's amended petition for writ of habeas corpus was in verified form, the court of appeals denied respondent's motion to dismiss. The court of appeals upheld the amount of the bond and the other conditions imposed on Chari's release. In so holding, the court of appeals noted that its alternative writ had required the sheriff to show cause why the relief that Chari requested should not be granted. The court of appeals then emphasized that the sheriff's reasons for the increase in Chari's bail bond did not justify the increase. The court of appeals also denied the sheriff's motion to dismiss.

This cause is now before the court upon the sheriff's appeal as of right.

The sheriff asserts in his first proposition of law that the court of appeals erred in placing the burden of proof on him to establish that Chari was not entitled to release from prison.

In general, persons accused of crimes are bailable by sufficient sureties, and "[e]xcessive bail shall not be required."[1] Section 9, Article I, Ohio Constitution. Habeas corpus is the proper remedy to raise the claim of excessive bail in pretrial-release cases. See *State ex rel. Smirnoff v. Greene* (1998), 84 Ohio St.3d 165, 168, 702 N.E.2d 423, 425, and cases cited therein.

In habeas corpus cases, the burden of proof is on the petitioner to establish his right to release. *Halleck v. Koloski* (1965), 4 Ohio St.2d 76, 77, 33 O.O.2d 441, 441–442, 212 N.E.2d 601, 602; *Yarbrough v. Maxwell* (1963), 174 Ohio St. 287, 288, 22 O.O.2d 341, 342, 189 N.E.2d 136, 137.

More specifically, in a habeas corpus proceeding, "where the return sets forth a justification for the detention of the petitioner, the burden of proof is on the petitioner to establish his right to release." *Id.* at 288, 22 O.O.2d at 342, 189 N.E.2d at 137. In satisfying this burden of proof, the petitioner must first introduce evidence to overcome the presumption of regularity that attaches to all court proceedings. *Id.* at 288, 22 O.O.2d at 342, 189 N.E.2d at 137.

Thus, in habeas corpus actions, "the state makes a *prima facie* case by showing by what authority it holds the prisoner" and the "burden of proceeding then shifts to the prisoner to introduce facts which would justify the granting of bail." See, *e.g.*, *Muller v. Bridges* (1966), 280 Ala. 169, 170, 190 So.2d 722, 723.

---

1. But preconviction bail may be denied for persons charged with a capital offense where the proof is evident or the presumption great and for persons charged with a felony where the proof is evident or the presumption great and where the person poses a substantial risk of serious physical harm to any person or to the community. Section 9, Article I, Ohio Constitution.

In analyzing the sheriff's assertion that the court of appeals erred in placing the burden of proof on him, the term as used in *Halleck* and *Yarbrough* encompasses two different aspects of proof: the burden of going forward with evidence (or burden of production) and the burden of persuasion. *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 219, 524 N.E.2d 889, 892; *State v. Robinson* (1976), 47 Ohio St.2d 103, 107, 1 O.O.3d 61, 63, 351 N.E.2d 88, 91. In other words, "[t]he burden of proof is a composite burden usually requiring the party on whom it rests to 'go forward' with the evidence (the 'burden of production') and to convince the trier of fact by some quantum of evidence (the 'burden of persuasion')." *Commonwealth v. Walker* (1976), 370 Mass. 548, 578, 350 N.E.2d 678, 698, fn. 21.

As the sheriff correctly contends, the court of appeals improperly placed the burden of production on him during the proceedings. Under R.C. 2725.14, the sheriff was required to specify in his return only that he had Chari in his custody and the authority for Chari's imprisonment. The sheriff complied with these requirements by stating in his return that Chari was in the county jail and attaching a copy of the March 31 $1,000,000 bail-bond order that authorized his imprisonment until the bond was posted. In fact, Chari's own petition included this order as well as the superseding indictment under which he was held in custody. Based on applicable precedent, after the sheriff's return, Chari had the burden to go forward and produce evidence to prove that the bail was excessive. *Yarbrough.*

Chari's assertion that the state has the burden of proof in excessive pretrial bail cases and that the sheriff failed to justify the *amount* of the trial court's bail order in his return lacks merit. Neither *Halleck* nor *Yarbrough* suggests that the burden of proof in habeas corpus cases is dependent upon the particular habeas claim. Other courts have placed the burden on the habeas corpus petitioner to prove that bail is excessive. See, *e.g., Kennedy v. Corrigan* (1960), 169 Neb. 586, 590–591, 100 N.W.2d 550, 553; *Delaney v. Shobe* (1959), 218 Ore. 626, 628, 346 P.2d 126, 127; *Ex Parte Parker* (Tex.App.2000), 26 S.W.3d 711, 712; *Ex Parte Sellers* (Tex.Crim.App.1974), 516 S.W.2d 665, 666. Therefore, consistent with *Halleck, Yarbrough,* and the foregoing cases, the burden of proof in a case alleging excessive bail is, as in other habeas corpus cases, on the petitioner. In addition, neither R.C. 2725.14 nor *Yarbrough* requires that the sheriff justify the *amount* of bail in the return; they require only that the return specify the authorization for Chari's pretrial detention. The sheriff complied with these requirements.

Therefore, the court of appeals erroneously compelled the sheriff to introduce evidence first, in contravention of the proper allocation of the burden of proof. *Halleck,* 4 Ohio St.2d at 77, 33 O.O.2d at 441–442, 212 N.E.2d at 602; *Yarbrough,* 174 Ohio St. at 288, 22 O.O.2d at 342, 189 N.E.2d at 137.

Generally, a lower court error in allocating the burden of proof, including the burden of going forward with evidence, requires a reversal and remand for a new hearing in which the burden is properly allocated. See, *e.g.*, *State v. Chase* (1978), 55 Ohio St.2d 237, 9 O.O.3d 180, 378 N.E.2d 1064; *State v. Doran* (1983), 5 Ohio St.3d 187, 193–194, 5 OBR 404, 410, 449 N.E.2d 1295, 1300–1301; *Bowling Green v. O'Neal* (1996), 113 Ohio App.3d 880, 883, 682 N.E.2d 709, 711.

We have, however, plenary authority in extraordinary writ cases to consider them as if they had been originally filed in this court. See *State ex rel. Natl. Electrical Contrs. Assn., Ohio Conference v. Ohio Bur. of Emp. Serv.* (2000), 88 Ohio St.3d 577, 579, 728 N.E.2d 395, 398 ("The court's plenary authority generally refers to our ability to address the merits of a writ case without the necessity of a remand if the court of appeals erred in some regard"); *State ex rel. Cleveland Police Patrolmen's Assn. v. Cleveland* (1999), 84 Ohio St.3d 310, 312, 703 N.E.2d 796, 797. We do so here to avoid the necessity of a remand because the court of appeals should never have allowed the writ, ordered a return, and held a hearing on Chari's habeas corpus petition.

R.C. Chapter 2725 prescribes a basic, summary procedure for bringing a habeas corpus action. *Gaskins v. Shiplevy* (1996), 76 Ohio St.3d 380, 381, 667 N.E.2d 1194, 1196. "First, application is by petition that contains certain information. R.C. 2725.04. Then, if the court decides that the petition states a facially valid claim, it must allow the writ. R.C. 2725.06. Conversely, if the petition states a claim for which habeas corpus relief cannot be granted, the court should not allow the writ and should dismiss the petition." *Pegan v. Crawmer* (1995), 73 Ohio St.3d 607, 609, 653 N.E.2d 659, 661. Even when a writ is allowed and a return is ordered, an evidentiary hearing, discovery, and physical presence of the petitioner are not always required. *Gaskins*, 76 Ohio St.3d at 382, 667 N.E.2d at 1196.

The court of appeals erred in allowing the writ and ordering a return.

First, Chari's petition did not satisfy the mandatory requirements of R.C. 2725.04, which requires that the petition be verified. In the absence of any statutory definition of the requisite verification, we must apply the word's usual, normal, or customary meaning. *State ex rel. Cuyahoga Cty. v. State Personnel Bd. of Review* (1998), 82 Ohio St.3d 496, 499, 696 N.E.2d 1054, 1057; R.C. 1.42. "Verification" means a "formal declaration made in the presence of an authorized officer, such as a notary public, by which one swears to the truth of the statements in the document." Garner, Black's Law Dictionary (7 Ed.1999) 1556; see, also, Webster's Third New International Dictionary (1986) 2543; *Youngstown Steel Door Co. v. Kosydar* (1973), 33 Ohio App.2d 277, 280, 62 O.O.2d 420, 422, 294 N.E.2d 676, 679 ("Verification under oath bespeaks some further formal act or presence calculated to bring to bear upon the declarant's conscience the full meaning of what he does").

Chari's habeas corpus petition did not contain any verification; therefore, the court of appeals should have dismissed it. See *Russell v. Mitchell* (1999), 84 Ohio St.3d 328, 329, 703 N.E.2d 1249, 1249–1250; *Evans v. Klaeger* (1999), 87 Ohio St.3d 260, 261, 719 N.E.2d 546, 547; *Sidle v. Ohio Adult Parole Auth.* (2000), 89 Ohio St.3d 520, 733 N.E.2d 1115. In fact, not even his amended petition, which was filed *after* the writ was allowed and a return ordered, met the R.C. 2725.04 verification requirement because neither Chari nor his attorney expressly swore to the truth of the facts contained therein. See *State ex rel. Hebert v. McFaul* (June 4, 1998), Cuyahoga App. No. 74246, unreported, 1998 WL 289365 ("Although a notary public has signed and affixed a seal to the complaint, petitioner has not complied with the requirements for the form of an affidavit"); but, cf., Civ.R. 11.

Second, in order to avoid dismissal, a petitioner must state with particularity the extraordinary circumstances entitling him to habeas corpus relief. *State ex rel. Wilcox v. Seidner* (1996), 76 Ohio St.3d 412, 414, 667 N.E.2d 1220, 1222. Unsupported conclusions contained in a habeas corpus petition are not considered admitted and are insufficient to withstand dismissal. *State ex rel. Carrion v. Ohio Adult Parole Auth.* (1998), 80 Ohio St.3d 637, 638, 687 N.E.2d 759, 760.

Chari's petition is replete with unsupported, legal conclusions, *i.e.*, that his bail is unlawful, excessive, and unconstitutional. In his petition, Chari alleged no facts that indicate either an abuse of discretion by the trial court or that appropriate grounds for independent review exist by the court of appeals or this court. See *Jenkins v. Billy* (1989), 43 Ohio St.3d 84, 85, 538 N.E.2d 1045, 1046, where we denied a writ without ordering a return in a habeas case involving an excessive-bail claim. The common pleas court was authorized to increase the amount of Chari's bail, and in making its determination, it could consider the nature and circumstances of the forty felonies charged in the March 31 superseding indictment, including the fact that Chari allegedly committed some of the offenses when he was previously on bail. Crim.R. 46(C) and (E); see, also, *In re Petition of Gentry* (1982), 7 Ohio App.3d 143, 145, 7 OBR 187, 189, 454 N.E.2d 987, 990.

Therefore, we reverse the judgment of the court of appeals and exercise our plenary authority to dismiss the cause.

*Judgment reversed*
*and cause dismissed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., dissents and would affirm the judgment of the court of appeals.

*Flanagan, Lieberman, Hoffman & Swaim, Richard Hempfling, Dennis A. Lieberman* and *Louis I. Hoffman,* for appellee.

*Mathias H. Heck, Jr.,* Montgomery County Prosecuting Attorney, and *Carley J. Ingram,* Assistant Prosecuting Attorney, for appellant.

THE STATE OF OHIO, APPELLEE, *v.* SHEPPARD, APPELLANT.

[Cite as *State v. Sheppard* (2001), 91 Ohio St.3d 329.]

(No. 00–1861—Submitted January 30, 2001—Decided April 11, 2001.)

*Per Curiam.* Appellant, Bobby T. Sheppard, was convicted of the aggravated murder of Dennis Willhide and sentenced to death. He was also convicted and sentenced to prison for aggravated robbery. The court of appeals affirmed the convictions and sentence. *State v. Sheppard* (June 11, 1997), Hamilton App. Nos. C–950402 and C–950744, unreported. On direct appeal as of right, we also affirmed. *State v. Sheppard* (1998), 84 Ohio St.3d 230, 703 N.E.2d 286, certiorari denied, *Sheppard v. Ohio* (1999), 527 U.S. 1026, 119 S.Ct. 2376, 144 L.Ed.2d 779.

Additionally, the trial court dismissed Sheppard's third amended petition for postconviction relief, and the court of appeals affirmed. *State v. Sheppard* (Mar. 26, 1999), Hamilton App. No. C–980569, unreported, 1999 WL 162457. We declined to accept Sheppard's appeal. *State v. Sheppard* (1999), 86 Ohio St.3d 1437, 713 N.E.2d 1049, certiorari denied, *Sheppard v. Ohio* (2000), 528 U.S. 1168, 120 S.Ct. 1190, 145 L.Ed.2d 1095.

On March 9, 2000, Sheppard filed an application with the court of appeals to reopen his appeal from his convictions pursuant to App.R. 26(B) and *State v.*

*Murnahan* (1992), 63 Ohio St.3d 60, 584 N.E.2d 1204, alleging ineffective assistance of appellate counsel before that court. However, the court of appeals found that Sheppard had failed to show good cause for filing his application more than ninety days after that court's judgment was journalized, as required by App.R. 26(B)(2)(b). *State v. Sheppard* (Oct. 2, 2000), Hamilton App. Nos. C–950402 and C–950744, unreported. Hence, that court denied Sheppard's application to reopen his appeal. The cause is now before this court upon an appeal as of right.

We affirm the judgment of the court of appeals, albeit for different reasons. The two-pronged analysis found in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, is the appropriate standard to assess whether Sheppard has raised a "genuine issue" as to the ineffectiveness of appellate counsel in his request to reopen under App.R. 26(B)(5). *State v. Spivey* (1998), 84 Ohio St.3d 24, 25, 701 N.E.2d 696, 697; *State v. Reed* (1996), 74 Ohio St.3d 534, 535, 660 N.E.2d 456, 458. To show ineffective assistance, Sheppard must prove that his counsel were deficient for failing to raise the issues he now presents and that there was a reasonable probability of success had he presented those claims on appeal. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

Moreover, to justify reopening his appeal, Sheppard "bears the burden of establishing that there was a 'genuine issue' as to whether he has a 'colorable claim' of ineffective assistance of counsel on appeal." *State v. Spivey,* 84 Ohio St.3d at 25, 701 N.E.2d at 697. We have reviewed Sheppard's assertions of deficient performance by appellate counsel and find that Sheppard has failed to raise "a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal" before the court of appeals as required under App.R. 26(B)(5).

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *William E. Breyer,* Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker,* Ohio Public Defender, and *Jane Perry,* Assistant Public Defender, for appellant.

THE STATE EX REL. CARROLL, APPELLANT, *v.* CORRIGAN, JUDGE, APPELLEE.

[Cite as *State ex rel. Carroll v. Corrigan* (2001), 91 Ohio St.3d 331.]

(No. 00–2001—Submitted February 27, 2001—Decided April 11, 2001.)

*Per Curiam.* In 1991, appellant, Daniel Carroll, was convicted of cocaine possession, carrying a concealed weapon, and having a weapon while under disability, with various accompanying specifications, and he was sentenced to prison. On appeal, the court of appeals affirmed the judgment. See *State v. Carroll* (June 10, 1993), Cuyahoga App. No. 62747, unreported, 1993 WL 204587; see, also, *State v. Carroll* (1995), 72 Ohio St.3d 87, 647 N.E.2d 784, where we affirmed the denial of Carroll's application to reopen the appeal.

In October 1993, Carroll filed a petition for postconviction relief, which the common pleas court denied in 1994.

In 1995, Carroll filed a second petition for postconviction relief in which he requested that his trial court correct his "illegal" sentence. In May 1996, appellee, Cuyahoga County Common Pleas Court Judge Daniel O. Corrigan, denied the requested relief.

In 1998, Carroll filed a complaint in the Court of Appeals for Cuyahoga County for a writ of mandamus to compel Judge Corrigan to issue findings of fact and conclusions of law on his May 1996 denial of Carroll's second petition for postconviction relief. The court of appeals denied the writ, and, in 1999, we affirmed the judgment because "Judge Corrigan did not have any duty to issue findings of fact and conclusions of law on Carroll's successive petition for postconviction relief." *State ex rel. Carroll v. Corrigan* (1999), 84 Ohio St.3d 529, 530, 705 N.E.2d 1226, 1227.

In June 2000, Carroll filed another complaint in the court of appeals, again requesting a writ of mandamus to compel Judge Corrigan to provide findings of fact and conclusions of law on his May 1996 denial of Carroll's successive petition for postconviction relief. The court of appeals subsequently dismissed the petition.

In his appeal as of right from that dismissal, Carroll asserts that because his second petition for postconviction relief raised different issues from his first petition, a writ of mandamus should be granted to compel Judge Corrigan to render findings of fact and conclusions of law on the 1996 denial of Carroll's second petition for postconviction relief.

Carroll's assertion is meritless. *Res judicata* bars Carroll from seeking the same relief in this mandamus action that he requested in his previous mandamus action. See, *e.g., State ex rel. Collins v. Pokorny* (1999), 86 Ohio St.3d 70, 71, 711 N.E.2d 683, 684. The judgment in his first mandamus action is conclusive on all claims that either were or *might have been* litigated in the first lawsuit. *Brown v. Dayton* (2000), 89 Ohio St.3d 245, 248, 730 N.E.2d 958, 962.

Moreover, even if *res judicata* did not bar Carroll's second mandamus action, he was not entitled to the requested extraordinary relief because the issuance of findings of fact and conclusions of law on his successive petition was within Judge Corrigan's discretion, and a writ of mandamus will not issue to control judicial discretion, even if that discretion is abused. *State ex rel. Jennings v. Nurre* (1995), 72 Ohio St.3d 596, 598, 651 N.E.2d 1006, 1008; R.C. 2731.03 and 2953.23(A).

Based on the foregoing, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

Moyer, C.J., Douglas, Resnick, F.E. Sweeney, Pfeifer, Cook and Lundberg Stratton, JJ., concur.

---

*Daniel Carroll, pro se.*

*William D. Mason,* Cuyahoga County Prosecuting Attorney, and *Andrew J. Nichol,* Assistant Prosecuting Attorney, for appellee.

OVERTON ET AL., APPELLANTS, *v.* WESTERN RESERVE GROUP, APPELLEE.

[Cite as *Overton v. W. Res. Group* (2001), 91 Ohio St.3d 333.]

(No. 00–277—Submitted March 28, 2001—Decided April 11, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Davidson v. Motorists Mut. Ins. Co.* (2001), 91 Ohio St.3d 262, 744 N.E.2d 713.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

*Boyk, McCulley & Crossmock* and *Steven L. Crossmock;* and *David G. Lake,* for appellants.

MYERS ET AL., APPELLEES, *v.* SAFECO INSURANCE
COMPANY OF AMERICA, APPELLANT.

[Cite as *Myers v. Safeco Ins. Co. of Am.* (2001), 91 Ohio St.3d 333.]

334

(Nos. 00–597 and 00–641—Submitted March 28, 2001—Decided April 11, 2001.)

The judgment of the court of appeals in case No. 00–597 is reversed on the authority of *Davidson v. Motorists Mut. Ins. Co.* (2001), 91 Ohio St.3d 262, 744 N.E.2d 713.

The certification of conflict in case No. 00–641 is dismissed, *sua sponte,* as having been improvidently certified.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

---

*Clark, Perdue, Roberts & Scott Co., L.P.A.,* and *Paul O. Scott,* for appellees.

*John C. Nemeth & Associates* and *John C. Nemeth,* for appellant.

DICKE ET AL., APPELLANTS, *v.* SAFECO INSURANCE COMPANY, APPELLEE.

[Cite as *Dicke v. Safeco Ins. Co.* (2001), 91 Ohio St.3d 334.]

(No. 01–343—Submitted March 28, 2001—Decided April 11, 2001.)

---

The judgment of the court of appeals is affirmed on the authority of *Davidson v. Motorists Mut. Ins. Co.* (2001), 91 Ohio St.3d 262, 744 N.E.2d 713.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

———————

*Gooding, Huffman, Kelley & Becker, L.L.C., T. Blain Brook II* and *Lawrence A. Huffman,* for appellants.

THE STATE OF OHIO, APPELLEE, *v.* JONES, APPELLANT.

[Cite as *State v. Jones* (2001), 91 Ohio St.3d 335.]

(No. 98–1483—Submitted October 10, 2000—Decided April 18, 2001.)

———————

FRANCIS E. SWEENEY, SR., J. On November 17, 1997, a dispatcher for the Ashtabula City Police Department advised officers that appellant Odraye G. Jones, an individual with outstanding felony warrants, had been spotted in the 900 block of West 43rd Street in Ashtabula. A week earlier, appellant had told his cousin, Jimmie Lee Ruth, that he "was facing a lot of time for robbing Isaac Coleman" and that he "was going to shoot at the police if they ever tried to arrest him."

Officer William D. Glover, Jr., responded to the dispatcher's call. Officer Glover found appellant with a friend, Anthony Gene Barksdale, and Jimmie Lee Ruth walking together on West 43rd Street. Officer Glover followed the three men to the home of one of their friends, Flo Chapman. Barksdale knocked on the door of the Chapman home while Ruth and appellant stood behind him on the porch. Officer Glover approached the Chapman home, got out of his car, and beckoned to appellant. Ruth testified that Officer Glover told appellant, "[C]ome on, you know why I'm here. I don't want no problem. I'm just doing my job." Appellant jumped off the side of the porch and began running down the side of the Chapman home. Officer Glover pursued him. Not long after the pursuit commenced, appellant turned around, pulled a .38 caliber revolver from his pocket, and began firing shots at Officer Glover.

After firing the first shot, appellant began to approach Officer Glover, firing several more shots. Officer Glover fell to the ground. Appellant turned and fled. He ran to a nearby fence and began to climb through a hole in it. Appellant then stopped, turned around, and ran back to where Officer Glover lay. Appellant kicked Officer Glover in the chest. The kick was done with such force that it left a large bruise on Officer Glover's chest that was visible to the paramedics who later treated Officer Glover at the scene. After kicking Officer Glover, appellant fled the scene.

As Officer Glover was pursuing appellant, another Ashtabula City Police Officer, Robert Stell, was en route in his patrol car. Officer Stell located appellant several blocks away from the scene of the shooting, still running. Officer Stell got out of his car and ordered appellant to stop. Appellant ignored the command and continued running. Officer Stell pursued appellant on foot. Appellant led Officer Stell into a nearby apartment complex. He stopped at the door of an apartment and began attempting to force his way inside. While appellant managed to squeeze part of his body through the door, the occupant of the apartment prevented appellant from fully entering. As appellant was struggling to enter the apartment, Officer Stell began to approach appellant. Officer Stell drew his weapon and ordered appellant to the ground. Appellant did not immediately respond. Appellant threw his revolver behind him. The gun landed in some nearby shrubbery. Officer Stell again ordered appellant to the ground and, this time, appellant complied. Officer Stell held appellant at gunpoint until assistance arrived. Officers recovered the weapon and appellant was placed under arrest. This gun was later matched to fired cartridge casings recovered at the scene of the shooting, live cartridges found on appellant at the time of his arrest, and bullets taken from Officer Glover's body. All of the ammunition was hollow point. This type of ammunition is designed to open up on impact, causing larger wounds.

Officer Glover had sustained gunshot wounds to the top of his head and to the area just below his right eye. He also sustained a bullet wound to his right shoulder. The gunshot wound to the top of Officer Glover's head and the wound to his face were both fired from a distance of less than one foot. The suddenness of appellant's attack had apparently caught Officer Glover by surprise. Officer Glover's duty weapon was found in Officer Glover's holster. The holster's strap was snapped securely shut.

Paramedics transported Officer Glover to Ashtabula County Medical Center for emergency treatment. After Officer Glover's condition had been stabilized, he was life-flighted to Cleveland's Metro–Health Hospital. X-rays and CT scans revealed substantial damage to Officer Glover's brain. Officer Glover had severe cerebral swelling and profuse bleeding from his nose and mouth. Neurological

assessments revealed minimal brain stem function. Officer Glover died from his gunshot wounds the following morning, November 18, 1997.

The state charged appellant with the aggravated murder of Officer Glover with prior calculation and design. This charge carried with it four specifications. Under the first specification, appellant was charged with killing Officer Glover for the purpose of escaping apprehension for his earlier aggravated robbery offense (R.C. 2929.04[A][3] ). The second and third specifications charged appellant with knowingly and purposefully causing the death of a law enforcement officer (R.C. 2929.04[A][6] ). The fourth specification charged appellant with using a firearm in the killing of Officer Glover (R.C. 2941.145).

Appellant was found guilty as charged in a jury trial, and the case proceeded to the penalty phase. The trial court merged the second and third death penalty specifications and instructed the jury to consider only the first and second.[1] Following a hearing, the jury recommended that appellant be sentenced to death. The trial court concurred. In addition to imposing the sentence of death, the trial court sentenced the defendant to a three-year mandatory term of imprisonment on the firearm specification.

The cause is now before this court upon an appeal as of right.

Appellant has raised fifteen propositions of law (see Appendix), which we have considered fully. We have considered the death penalty for appropriateness and proportionality, and we have independently weighed the aggravating circumstances against the evidence presented in mitigation. For the reasons that follow, we affirm appellant's convictions and the sentence imposed.

## PRETRIAL ISSUES

### Restrictions on Voir Dire

In his first proposition of law, appellant argues that he should have been permitted to ask prospective jurors about their views on specific mitigating factors. Appellant suggests that the trial court's refusal to permit this line of questioning left several jurors confused as to the meaning of mitigation. Appellant believes that his inability to ask about specific mitigating factors, coupled with juror confusion about the meaning of mitigation, limited his ability to uncover potential biases in prospective jurors and may have resulted in the empanelling of jurors who were unwilling to consider mitigating factors.

---

1. The fourth specification of which defendant was convicted, the firearm specification, is not an aggravating circumstance warranting the death penalty under R.C. 2929.04(A). The jury was therefore instructed to disregard this specification in the penalty phase.

During voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors. See *State v. Wilson* (1996), 74 Ohio St.3d 381, 385–386, 659 N.E.2d 292, 300–301; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304, 315. Realistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law. *Id.* We reject appellant's first proposition of law.

### Juror Bias

In his third proposition of law, appellant contends that several errors committed during voir dire require us to order a retrial. First, appellant argues that the prosecutors' use of peremptory challenges to exclude those jurors who expressed reservations about the death penalty denied him his right to a fair and impartial jury. This argument lacks merit. It is well established that "death-qualifying a jury 'does not deny a capital defendant a trial by an impartial jury.'" *State v. Dunlap* (1995), 73 Ohio St.3d 308, 315, 652 N.E.2d 988, 995, quoting *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph two of the syllabus. Indeed, prosecutors may even exclude a juror for cause when the juror's views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt* (1985), 469 U.S. 412, 433, 105 S.Ct. 844, 857, 83 L.Ed.2d 841, 857, followed in *Dunlap* at 315, 652 N.E.2d at 995.

Second, appellant argues that the trial court erred in failing to excuse two jurors for cause. The first juror is Juror Lance McCollum, who appellant suggests should have been dismissed *sua sponte.* Juror McCollum testified during voir dire that he had discussed the case with his ex-father-in-law, the former chief of police of Ashtabula. McCollum stated that he was, to some degree, biased against the defense. However, McCollum also stated that he would try to disregard the conversation with his ex-father-in-law, would decide the case only on the evidence, and would accord the accused the usual presumption of innocence.

We find no error in the trial court's decision not to excuse Juror McCollum. The conversation between McCollum and his ex-father-in-law did not, by itself, require McCollum's exclusion. While fairness requires that jurors be impartial, jurors need not be totally ignorant of the facts and issues involved. *State v. Sheppard* (1998), 84 Ohio St.3d 230, 235, 703 N.E.2d 286, 292. The trial court was entitled to accept McCollum's assurances that he would be fair and impartial and would decide the case on the basis of the evidence. "[D]eference must be paid to the trial judge who sees and hears the juror." *Wainwright*, 469 U.S. at 426, 105 S.Ct. at 853, 83 L.Ed.2d at 853. Furthermore, appellant has waived any potential

error by failing to challenge the prospective juror at trial. *State v. Smith* (1997), 80 Ohio St.3d 89, 105, 684 N.E.2d 668, 685.

Appellant also contends that the trial court erred in denying a challenge for cause brought against another prospective juror, a Mr. Shears, who testified during voir dire that, according to his religious beliefs, one who takes the life of another should "automatically" lose his own life. However, Mr. Shears further testified that he would follow the law and that he was capable of considering a penalty less than death.

Here again, the trial court's determination that Juror Shears's scriptural beliefs would not prevent or impair his ability to perform his duties as a juror is entitled to deference. *Wainwright*, 469 U.S. at 426, 105 S.Ct. at 853, 83 L.Ed.2d at 853. Where, as here, a juror gives conflicting answers, it is for the trial court to determine which answer reflects the juror's true state of mind. *State v. Webb* (1994), 70 Ohio St.3d 325, 339, 638 N.E.2d 1023, 1035–1036. Appellant's third proposition of law is overruled.

### Change of Venue

Appellant argues in his fourth proposition of law that the trial court's denial of his request to change venue violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution. Appellant based his request for a change of venue on the fact that only a handful of the original jury pool were African–Americans and that none of these individuals found their way onto the jury. Defense counsel pointed out to the trial court that the demographics of Ashtabula County resulted in African–Americans being unable to serve. Defense counsel noted that in Ashtabula County, there is only one central area where most African–Americans live and that this is the area in which the crime occurred. Thus, appellant's counsel argued, holding the trial in Ashtabula County virtually eliminated African–Americans as potential jurors because most people in the area were either aware of the details of the crime or knew the parties or their families. The trial court rejected appellant's request, relying upon a recent decision from this court, *State v. Moore* (1998), 81 Ohio St.3d 22, 28, 689 N.E.2d 1, 9, which held that it is constitutional to rely upon voter registration rolls as exclusive sources for jury selection, as the trial court did in the instant case.

"[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana* (1975), 419 U.S. 522, 528, 95 S.Ct. 692, 697, 42 L.Ed.2d 690, 697. However, the Sixth Amendment does not require that petit juries "mirror the community and reflect the various distinctive groups in the population." *Id.* at 538, 95 S.Ct. at 702, 42 L.E.2d at 703. Under the Sixth

Amendment, "[d]efendants are not entitled to a jury of any particular composition, * * * but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.*

In *Duren v. Missouri* (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579, the United States Supreme Court held that in order to establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, a defendant must demonstrate "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587. Accord *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph two of the syllabus.

In reviewing the propriety of appellant's arguments concerning the jury venire in the instant case, we find that appellant has failed to establish all of the elements of a prima facie violation of the fair cross-section requirement.

Appellant has satisfied the first prong of the *Duren* analysis. For purposes of the fair cross-section analysis, African–Americans are a distinctive group. *United States v. Buchanan* (C.A.6, 2000), 213 F.3d 302, 310; *United States v. Rioux* (C.A.2, 1996), 97 F.3d 648, 654. However, appellant has not satisfied the remaining prongs of *Duren*. With respect to the second prong, for example, appellant has come forward with no evidence to suggest that African–Americans in Ashtabula County are unfairly represented in venires in relation to their number in the community. He merely alleges that African–Americans were not adequately represented on his particular venire and jury.

Even if the appellant's venire was underrepresentative, the appellant has not presented any evidence of "systematic exclusion" as required under the third prong of *Duren*. Appellant must do more than show that his particular panel was unrepresentative. Where, as here, the trial court relies upon voter registration lists, the defendant-appellant "must demonstrate that the voter-registration qualifications are suspect, or that the jury-selection procedure is administered in a discriminatory manner." *United States v. Ireland* (C.A.8, 1995), 62 F.3d 227, 231. There is nothing inherently unconstitutional about using voter-registration rolls as exclusive sources for jury selection. *Moore,* 81 Ohio St.3d at 28, 689 N.E.2d at 9. Because appellant has failed to demonstrate systematic discrimination, we reject his Sixth Amendment claim.

A defendant may also bring a federal equal protection challenge to the selection and composition of the petit jury. *Fulton,* 57 Ohio St.3d at 123–124, 566 N.E.2d at 1200, citing *Duren,* 439 U.S. at 368, 99 S.Ct. at 670, 58 L.Ed.2d at 589,

fn. 26. To establish this equal protection claim, the defendant must "adduc[e] statistical evidence which shows a significant discrepancy between the percentage of a certain class of people in the community and the percentage of that class on the jury venires, which evidence tends to show discriminatory purpose." *Id.* This evidence is then subject to rebuttal evidence suggesting that either no discriminatory purpose was involved or that such purpose had no "determinative effect." *Id.; Duren,* 439 U.S. at 368, 99 S.Ct. at 670, 58 L.Ed.2d at 589, fn. 26.

The appellant has offered no statistical evidence showing a discrepancy between the percentage of African–Americans in Ashtabula County and the percentage of African–Americans on jury venires. We therefore reject appellant's equal protection argument. Having rejected appellant's arguments under the Sixth and Fourteenth Amendments, we find that the trial court did not err in denying appellant's motion for a change of venue.

## Choice of Counsel

In his fifth proposition of law, appellant argues that the trial court denied him the right to counsel guaranteed under the Sixth Amendment to the United States Constitution. On May 14, 1998, approximately two hours after the jury was sworn, attorney David Per Due filed an entry of appearance with the trial court. The following morning, a hearing was held. Present at this hearing were appellant's court-appointed counsel, the prosecution, and Per Due. Appellant indicated to the trial court that he wanted Per Due to represent him. Appellant stated that he had a "conflict of interest" with the court-appointed attorneys who had been representing him to that point. Specifically, appellant felt that his court-appointed attorneys were "mostly concerned with saving [his] life." He further stated that "if [they] can't win the case for me, then [they] can't do nothing for me." Appellant's court-appointed attorneys explained to the trial court that their relationship with the appellant had been "pretty good" and that there existed an open line of communication between themselves and appellant. They acknowledged appellant's concern that they were not concentrating upon acquittal. They further noted that appellant was concerned that the relationship between themselves and the prosecution had, to that point, been too cordial. Appellant concurred with this assessment.

The trial court offered to let Per Due assist appellant's court-appointed counsel. However, the trial court would not allow Per Due to act as lead counsel because he had not been death-penalty certified by this court. When the court asked Per Due if he would be ready to commence with trial the following Monday, he responded, "Absolutely not." Instead, Per Due requested a four-month continuance. He further indicated that he would be unwilling to assist appellant's court-appointed attorneys as third counsel.

The court denied Per Due's motions for entry and a continuance, concluding that the relationship between appellant and his court-appointed attorneys did not warrant a change in counsel. The court further concluded that the request for continuance was made in bad faith and for purposes of delay. The trial court noted that there had never been, up to that point, any indication that there was a lack of cooperation or trust between appellant and his attorneys.

"The grant or denial of a continuance is a matter [that] is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080. In evaluating a motion for a continuance, a trial court should consider, *inter alia,* the length of the delay requested; the inconvenience to the litigants, witnesses, opposing counsel, and the court; and whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived. *Id.* at 67–68, 21 O.O.3d at 43, 423 N.E.2d at 1080.

The trial court acted within the bounds of its discretion in denying the motion for continuance. Because the trial had already commenced, the lengthy delay requested by appellant and Per Due would have greatly inconvenienced everyone involved in the case, including the witnesses, the prosecution, the trial court, and the jury, which had already been sworn. Given the timing of the motion, and the fact that appellant had never, up to that point, expressed any concerns about his court-appointed counsel, it was reasonable for the trial court to conclude that the continuance was requested in bad faith and for purposes of delay.

Because Per Due adamantly refused to immediately proceed with trial, the trial court's refusal to grant the continuance effectively denied appellant the services of Per Due. We reject appellant's contention that this denial violated his Sixth Amendment right to counsel.

"[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate * * * rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States* (1988), 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140, 148. Thus, "[a] defendant has only a *presumptive* right to employ his own chosen counsel." (Emphasis *sic.*) *State v. Keenan* (1998), 81 Ohio St.3d 133, 137, 689 N.E.2d 929, 937. Factors to consider in deciding whether a trial court erred in denying a defendant's motion to substitute counsel include "the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense." *United States v. Jennings* (C.A.6, 1996), 83 F.3d 145, 148. In addition, courts should "balanc[e]

* * * the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *Id.* Decisions relating to the substitution of counsel are within the sound discretion of the trial court. *Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700, 100 L.Ed.2d at 152.

The trial court conducted an extensive inquiry into the appellant's relationship with his court-appointed counsel. The record supports the trial court's determination that any problems between appellant and his attorneys had not led to a total lack of communication. Indeed, both appellant and his attorneys agreed that the lines of communication between them were open. In balancing the accused's right to the representation of his chosen counsel against the interests of the public in the prompt and efficient administration of justice, the trial court correctly found that the public's interests outweighed those of the appellant. Accordingly, we find no abuse of discretion in the trial court's refusal to substitute Per Due for court-appointed counsel. We must therefore overrule appellant's fifth proposition of law.

## TRIAL ISSUES

### Admissibility of Evidence

In his sixth proposition of law, appellant argues that the trial court erred during the guilt phase in admitting evidence concerning the efforts made to save Officer Glover's life. Specifically, appellant challenges the admission of evidence concerning Officer's Glover's difficulty in breathing, his internal bleeding and brain injury, and the consultations between medical personnel and Officer Glover's family. Appellant also challenges the introduction of Officer Glover's medical records. Appellant contends that this evidence was both irrelevant and unduly prejudicial. Because appellant's counsel failed to object to the admission of this evidence at trial, he now waives all but plain error. *State v. Joseph* (1995), 73 Ohio St.3d 450, 455, 653 N.E.2d 285, 291. "Plain error does not exist unless, but for the error, the outcome at trial would have been different." *Id.*

For the most part, the medical evidence that appellant now challenges illustrated the nature and circumstances of the crime, including the physical condition and circumstances of the victim. This type of evidence is relevant and admissible. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212, 218. "The victi[m] cannot be separated from the crime." *Id.* at 420, 613 N.E.2d at 218–219. Furthermore, evidence detailing the impact of the crime on the victim's family is admissible when, as here, it is coupled with evidence depicting the circumstances surrounding the crime. *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878, 883.

Assuming, *arguendo,* that the medical evidence admitted by the trial court was unduly prejudicial or cumulative in nature, we find that its admission does not

constitute plain error. There is no doubt that the jury would have convicted appellant even if it had never been presented with this evidence. The evidence produced at trial clearly established that the appellant committed the charged crimes. As for admission of this medical evidence at the sentencing phase, we find that, given the severity of the aggravating circumstances, admission of the medical evidence could not have had a determinative effect upon the trial court's sentencing decision. In sum, we conclude that admission of the medical evidence, even if error, did not work to the material prejudice of the appellant. Therefore, appellant's sixth proposition of law is overruled.

In his seventh proposition of law, appellant points to three items of evidence that he believes should not have been admitted at trial. Appellant contends that the admission of this evidence constituted reversible error.

The first item of evidence consists of testimony from Officer Stell, the arresting officer. On direct examination, the prosecution examined Officer Stell regarding the day of the shooting and the moment at which he recognized appellant and began his foot pursuit. The prosecution asked Officer Stell to explain how he was able to recognize appellant. Officer Stell responded, "[F]rom times we have had him in our jail." Defense counsel objected. The trial court sustained the objection and instructed the jury to disregard Officer Stell's comment about appellant's being in jail.

Appellant also challenges testimony from Anthony Barksdale. During the prosecution's redirect examination of this witness, the prosecution asked whether the witness had been given a lie detector test. Defense counsel objected, but before the court could rule, the witness responded affirmatively. The trial court sustained the objection and instructed the jury to disregard the question. The trial court also admonished the prosecution not to make any further references to the lie detector test.[2] The defense counsel moved the trial court for a mistrial. The trial court did not grant this motion.

With respect to the testimony of both Officer Stell and Anthony Barksdale, we find no error in the trial court's reliance upon curative instructions and its refusal to grant a mistrial in response to Barksdale's testimony. The jury is presumed to have followed the court's instructions. *State v. Raglin* (1998), 83 Ohio St.3d 253, 264, 699 N.E.2d 482, 492.

Finally, appellant argues that the trial court erred in admitting certain "inflammatory statements" made by appellant. Specifically, appellant refers to the following statement he made just prior to arraignment: "If I had my SKS

---

2. In Ohio, the results of a polygraph examination are admissible in evidence in a criminal trial for purposes of corroboration or impeachment only when the prosecution and defense stipulate to their admissibility. *State v. Souel* (1978), 53 Ohio St.2d 123, 7 O.O.3d 207, 372 N.E.2d 1318, syllabus.

[Russian assault rifle], I would have killed 16 of you mother fuckers," referring to the police. Appellant also objects to the admission of his statement to Jimmie Lee Ruth that appellant "was going to shoot at the police if they ever tried to arrest him." Appellant contends that, under Evid.R. 403(A),[3] these statements should not have been admitted because their potential prejudicial effect substantially outweighed their probative value. We disagree.

Both statements were of considerable probative value. Appellant's first statement regarding his assault rifle and what he would do with it helped to prove appellant's identity as the shooter in this case and helped to establish his intent to kill a police officer. Similarly, appellant's statement to Jimmie Lee Ruth helped to establish that he killed Officer Glover with prior calculation and design. It also tended to support the state's charges that appellant's specific purpose was to kill a police officer and that he killed to escape apprehension for aggravated robbery. We find no abuse of discretion in the trial court's determination that the probative value of these statements outweighed their potential prejudicial effect. We reject appellant's seventh proposition of law.

## Sufficiency of the Evidence

In his eighth proposition of law, appellant argues that the state failed to prove, beyond a reasonable doubt, that he killed Officer Glover with prior calculation and design. According to appellant, the trial court erred in submitting this issue to the jury.

When reviewing the sufficiency of the evidence to support a criminal conviction, the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Stallings* (2000), 89 Ohio St.3d 280, 289, 731 N.E.2d 159, 171. "[T]he phrase 'prior calculation and design' * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." *State v. Taylor* (1997), 78 Ohio St.3d 15, 19, 676 N.E.2d 82, 88. The amount of care or time that the defendant spends in planning and analyzing the crime are not critical factors in themselves; however, they "must amount to more than momentary deliberation." *Id.* In short, there is no bright-line test for determining the existence of prior calculation and design. *Id.* at 20, 676 N.E.2d at 89. "[E]ach case turns on the particular facts and evidence presented at trial." *Id.*

---

3. Evid.R. 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

Whether a defendant's prior statement of intent to kill a police officer constitutes evidence of prior calculation and design depends largely upon the totality of other facts and circumstances surrounding the killing. In *State v. Reed* (1981), 65 Ohio St.2d 117, 120–121, 19 O.O.3d 311, 313–314, 418 N.E.2d 1359, 1362–1363, we held that a defendant's isolated statement that "if a cop got in his way [during a robbery] he would blow him away" did not, by itself, establish prior calculation and design when the totality of the facts and circumstances indicated that the killing resulted from an instantaneous deliberation. More recently, in *State v. White* (1998), 82 Ohio St.3d 16, 24, 693 N.E.2d 772, 779–780, we suggested that such statements could be used to establish prior calculation and design. The distinguishing factor in the *White* decision was the presence of other evidence establishing prior calculation and design. Unlike in *Reed*, the defendant's threat to kill a police officer in *White* was repeated several times. In *White*, there was also evidence presented at trial indicating that the defendant, who was on probation, would do whatever necessary to avoid being returned to prison. Here, as in *White*, the totality of facts and circumstances surrounding the killing, including the manner in which appellant killed Officer Glover, clearly indicates that appellant's act of killing was not an instantaneous decision and that his prior statement of intent to kill a police officer was not merely an idle threat. Accordingly, we are willing to consider appellant's threat as evidence of prior calculation and design.

Viewing the evidence in the light most favorable to the prosecution, we find that the jury could have found the element of prior calculation and design proven beyond a reasonable doubt. Shortly before the murder, appellant informed his cousin that he "was going to shoot at the police if they ever tried to arrest him." On the day of the murder, appellant was armed with a .38 caliber revolver. When approached by the police, appellant followed up on his promise to his cousin, executing Officer Glover with two point-blank gunshots to the head. This evidence clearly establishes, beyond a reasonable doubt, that appellant killed Officer Glover with prior calculation and design.

Appellant also argues in his eighth proposition of law that the state failed to prove that he killed Officer Glover for the purpose of escaping apprehension for aggravated robbery, the first death penalty specification. Appellant contends that the prosecution bore the burden of proving his commission of the aggravated robbery offense beyond a reasonable doubt.

The state argues that appellant waived this claim by failing to raise the issue at trial. We disagree. Appellant's "not guilty" plea preserved his right to object to the alleged insufficiency of the evidence proving the prior offense. See *State v. Carter* (1992), 64 Ohio St.3d 218, 223, 594 N.E.2d 595, 599.

R.C. 2929.04 sets forth the criteria for imposing the sentence of death for the commission of a capital offense. The statute provides that the death penalty may be imposed when it is proven beyond a reasonable doubt that the capital offense "was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense *committed by the offender.*" (Emphasis added.) R.C. 2929.04(A)(3). Appellant contends that, under this statute, the state must prove that the defendant committed the offense for which he sought to avoid apprehension by proof beyond a reasonable doubt. We agree.

Appellant's interpretation of R.C. 2929.04(A)(3) is consistent with both the statute's plain language and established constitutional law. R.C. 2929.04(A) plainly states that all of the aggravating circumstances listed therein, including that contained in subsection (A)(3), must be proven beyond a reasonable doubt. Indeed, conviction under any lesser standard of proof would be inconsistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. It is axiomatic that the state must prove each and every element of an offense beyond a reasonable doubt. See *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. We find that the defendant's commission of the prior offense constitutes an essential element of the R.C. 2929.04(A)(3) specification. Had the General Assembly intended that the death penalty be applied to those who simply attempt to avoid apprehension on a warrant, it would not have included the words "committed by the offender."

We conclude, however, that in the case *sub judice,* the state proved, beyond a reasonable doubt, that appellant had committed the prior offense for which he sought to avoid apprehension. The state introduced evidence that a week before the killing, appellant told his cousin Jimmie Ruth that he "was facing a lot of time for robbing Isaac Coleman." Appellant's admission proves beyond a reasonable doubt that he committed the prior offense of aggravated robbery. We therefore affirm appellant's conviction on the R.C. 2929.04(A)(3) specification.

## Trial Phase Instructions

In his ninth proposition of law, appellant challenges three jury instructions. Because appellant failed to object to these instructions during the trial, he now waives all but plain error. *Joseph,* 73 Ohio St.3d at 455, 653 N.E.2d at 291.

Appellant challenges the trial court's reasonable doubt instruction, which the court recited verbatim from R.C. 2901.05(D). Appellant argues that this instruction unconstitutionally permits juries to convict upon a standard of proof below proof beyond a reasonable doubt. We summarily reject this argument. We have repeatedly affirmed the constitutionality of R.C. 2901.05(D)'s definition of reason-

able doubt. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 115, 734 N.E.2d 1237, 1246; *State v. Getsy* (1998), 84 Ohio St.3d 180, 202, 702 N.E.2d 866, 888.

Appellant also challenges the trial court's instruction on the two separate elements of purpose and prior calculation and design. Appellant argues that the court's instruction equated the two concepts and essentially directed a verdict on the element of prior calculation and design.

The record does not support appellant's contention that the trial court equated purpose with prior calculation and design. The court defined "purpose" as "a decision of the mind to do an act with a conscious objective of producing a specific result." It noted that the terms "purpose" and "intent" are synonymous. While the court went on to explain how the element of "prior calculation and design" relates to the element of "purpose," the court's instruction in no way confused these elements. The court explained that "prior calculation and design" means that "the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and means with which to cause the death of another." The court further explained that prior calculation and design includes "planning," "a scheme designed to carry out the calculated decision to cause the death." Finally, the court noted that prior calculation and design does not include "spur of the moment" decisions. We find no error in these instructions. The instructions are consistent with the standardized Ohio Jury Instructions and our own definitions of these elements. See 4 Ohio Jury Instructions (1997), Sections 409.01 and 503.01(A)(4); R.C. 2901.22(A) (defining "purposeful" action); *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph three of the syllabus (defining "prior calculation and design").

Finally, appellant argues that the trial court improperly shifted the burden of proof from the state to the defense when it instructed the jury to deliberate on the guilt "or innocence" of appellant. The trial court instructed the jury that in the guilt phase of the trial they should "not consider at this time or in any way discuss the subject matter of punishment." The court instructed the jury that its duty was "confined to the determination of the guilt or innocence of the defendant." Appellant contends that a reasonable jury would have understood this instruction to mean that the defendant bore the burden of putting forward evidence of his innocence.

We disagree with appellant's suggestion that the trial court's instruction effectively shifted the burden of proof from the state to the defendant. Any reasonable juror would have taken the instruction as nothing more than a warning not to consider punishment during the guilt phase. "A single instruction to a jury may not be judged in artificial isolation but must be viewed in the

context of the overall charge." *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Given the trial court's repeated instruction to the jury that the state bore the burden of proving guilt beyond a reasonable doubt, no reasonable juror could have concluded that the single instruction set forth above shifted the burden of proof to the defendant.

## SENTENCING ISSUES

### Duplicative Death Penalty Specifications

In his tenth proposition of law, appellant argues that the trial court erred in failing to merge the R.C. 2929.04(A)(3) and (A)(6) death penalty specifications. These specifications represent, respectively, killing to escape apprehension and killing a law enforcement officer.

Where two or more aggravating circumstances arise from the same act or indivisible course of conduct, they are duplicative and must be merged for purposes of sentencing. *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. Merger is not required when the aggravating circumstances arise from a divisible course of conduct. *State v. Robb* (2000), 88 Ohio St.3d 59, 85, 723 N.E.2d 1019, 1047.

Appellant's act of fleeing and his killing of Officer Glover were part of a divisible course of conduct. Therefore, merger of the R.C. 2929.04(A)(3) and (A)(6) death penalty specifications was unnecessary. Appellant's purpose to escape apprehension for his prior robbery offense is demonstrated by his fleeing when Officer Glover approached him at the Chapman home. Although appellant killed Officer Glover after fleeing, the circumstances surrounding the killing reveal that it was a distinct, divisible act. When appellant had drawn his weapon and aimed it at Officer Glover, he had stopped running. Appellant fired shots at Officer Glover while walking toward him. Appellant's killing of Officer Glover was clearly a separate act, which demonstrated a separate animus. The killing was in no way implicit in appellant's decision to flee Officer Glover. *Id.* See, also, *White*, 82 Ohio St.3d 16, 693 N.E.2d 772 (R.C. 2929.04[A][3] and [A][6] specifications treated as separate).

### Penalty Phase Instructions

In his twelfth proposition of law, appellant challenges several of the trial court's instructions to the jury at the penalty phase. First, appellant argues that the trial court erred when it instructed the jury that "only that testimony and evidence which was presented in the first phase that is relevant to the aggravating circumstances [appellant] was found guilty of committing, or to any of the mitigating factors that will be described below, is to be considered by you." Appellant suggests that this instruction improperly permitted the jury to deter-

mine what evidence was relevant. Because appellant failed to raise this issue in the trial court, he waives all but plain error. *Joseph*, 73 Ohio St.3d at 455, 653 N.E.2d at 291. We find no plain error here.

The trial court's instruction was ambiguous as to whether relevance was to be determined by the court or the jury. We agree that the trial court's instruction could reasonably be interpreted by one or more members of the jury as implying that it was their responsibility to determine the relevance of evidence presented during the first phase of trial. Of course, jurors may also have interpreted the court's statement as instructing them to consider only that evidence that the court deemed relevant. This interpretation is particularly plausible given that immediately after the trial court gave the challenged instruction, it further instructed the jury that it would allow it to consider during deliberations only those exhibits which it, as the trial court, determined to be relevant.

To the extent that the jury interpreted the trial court's instruction as allowing them to determine relevancy, the trial court misled the jury. It is "the trial court's responsibility, not the jury's, to determine what evidence [is] relevant." *Getsy*, 84 Ohio St.3d at 201, 702 N.E.2d at 887. We find, however, that the trial court's misstatement did not prejudice the outcome of this case. Much of the trial phase evidence was relevant at the sentencing phase because it was related to the aggravating circumstances, the nature and circumstances of the offense, and the asserted mitigating factors. See *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus. Moreover, we find that the aggravating circumstances in this case outweigh the mitigating evidence. Therefore, no basis exists for finding outcome-determinative plain error in the trial court's instruction on relevance.

Appellant also challenges, in his twelfth proposition of law, the trial court's denial of defense counsel's requested instruction that a sole juror could prevent a verdict of death. We find no error in the trial court's instruction. Trial courts must instruct juries that "[i]n Ohio, a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." *State v. Brooks* (1996), 75 Ohio St.3d 148, 162, 661 N.E.2d 1030, 1042. In advising juries of the need for a unanimous verdict, no specific language has to be used as long as the "substance" of what the jury must determine is included in the charge given. See *State v. Goff* (1998), 82 Ohio St.3d 123, 129, 694 N.E.2d 916, 922.

The substance of the trial court's charge adequately conveyed the need for unanimity. The court instructed the jury that "[i]n order for you to decide that the sentence of death shall be imposed upon [the appellant], the State of Ohio has the burden to prove to each member of this jury beyond a reasonable doubt that the aggravating circumstances * * * outweigh the factors in mitigation." At

another point in its charge, the trial court instructed that "all twelve members" of the jury had to find that the aggravating circumstances outweigh mitigation before death could be imposed. Finally, the trial court instructed that the jury had to consider life sentence options "if any one or more of you conclude the State has failed to prove that the aggravating circumstances outweigh the mitigating factors." The need for a unanimous verdict was more than adequately conveyed by these instructions.

Finally, appellant argues that the trial court denied him due process of law when it failed to instruct the jury on the issue of sympathy. We summarily reject this argument. It is well established that sympathy and mercy are not relevant sentencing criteria. See *Taylor*, 78 Ohio St.3d at 30, 676 N.E.2d at 96; *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687.

### Constitutional Error in the Trial Court's Sentencing Opinion

In his fourteenth proposition of law, appellant challenges two aspects of the trial court's sentencing opinion. First, appellant contends that the court failed to properly consider psychological evidence submitted under R.C. 2929.04(B)(7). R.C. 2929.04(B)(7) requires trial courts to consider, in addition to the specific mitigating factors set forth in R.C. 2929.04(B), "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death."

We conclude that the trial court thoroughly considered the evidence submitted by the appellant under R.C. 2929.04(B)(7). The trial court made specific findings as to the existence of appellant's psychological disorders as required under R.C. 2929.03(F). The court found that this mitigation evidence was entitled to little weight. Specifically, the court weighed against appellant's mitigation evidence other evidence that appellant's psychological disorders did not prevent him from understanding the criminality of his conduct or conforming his conduct to the requirements of the law. The trial court concluded that this evidence, along with evidence that appellant was fairly sophisticated and intelligent, required that the psychological disorders be accorded little weight. The court acted well within its discretion in making this determination. " '[T]he assessment and weight to be given mitigating evidence are matters for the trial court's determination.' " *State v. Mitts* (1998), 81 Ohio St.3d 223, 235, 690 N.E.2d 522, 532, quoting *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, 305.

Appellant contends that the trial court's reference to appellant's ability to conform his conduct to the requirements of the law suggests that the court confused appellant's psychological evidence, offered by the defense under the R.C. 2929.04(B)(7) catchall provision, with evidence offered under R.C. 2929.04(B)(3), a provision that makes the defendant's ability to conform his conduct to the requirements of the law a mitigating factor. Appellant's argument

lacks any merit. We fail to see how the trial court's alleged weighing of the psychological evidence under (B)(3) rather than (B)(7) could possibly have prejudiced the appellant, especially in light of the fact that the trial court weighed the psychological evidence against other evidence unrelated to (B)(3), namely, appellant's intelligence. In any event, "[t]he process of weighing mitigating factors * * * is a matter for the discretion of the individual decisionmaker." *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124, 132. We find no abuse of that discretion here.

In his fourteenth proposition of law, appellant also argues that the trial court improperly accorded "exceptional weight" to the fact that the victim in this case was a law enforcement officer—the R.C. 2929.04(A)(6) aggravating circumstance. Appellant accuses the trial court of creating "a kind of 'super' aggravating circumstance that no amount of mitigation could outweigh." Specifically, appellant challenges the trial court's statement that "the act of killing a police officer who, in the pursuit of his duties is attempting to apprehend a person accused of a felony crime, strikes at the very heart of the justice system."

We reject appellant's argument. The trial court never suggested that the mitigating evidence in this case could not outweigh this aggravating factor. The trial court's statement regarding the severity of killing a police officer was not improper. Courts are certainly entitled to consider the gravity of the aggravating circumstances. See, *e.g.*, *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246, 266–267 (noting that the killing of a witness in order to avoid prosecution is an act that strikes at the heart of the criminal justice system); *State v. Coleman* (1999), 85 Ohio St.3d 129, 145, 707 N.E.2d 476, 491.

## PROSECUTORIAL MISCONDUCT

In his eleventh proposition of law, appellant contends that prosecutorial misconduct at several stages of his trial denied him due process of law. First, appellant argues that the prosecution engaged in misconduct when, during voir dire, it informed prospective jurors that they could determine what evidence was mitigating. Because appellant failed to raise this objection during trial, he now waives all but plain error. *Joseph*, 73 Ohio St.3d at 455, 653 N.E.2d at 291.

We find no error, plain or otherwise, in the prosecution's statements to prospective jurors regarding mitigation. The prosecution merely reminded prospective jurors that it was their duty to determine what evidence does in fact mitigate the appellant's crime and what weight to give this evidence. This was not improper. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d at 309. The prosecution's statements correctly

summarized the law on mitigation. "[T]he jury * * * may properly choose to assign absolutely no weight to * * * evidence if it considers it to be non-mitigating." *State v. Steffen* (1987), 31 Ohio St.3d 111, 129, 31 OBR 273, 289, 509 N.E.2d 383, 399. Even if the prosecution's statements were improper, we can find no plain error here. Statements made during voir dire cannot reasonably be thought to affect sentencing verdicts. See *Darden v. Wainwright* (1986), 477 U.S. 168, 183–184, 106 S.Ct. 2464, 2472–2473, 91 L.Ed.2d 144, 158–159, fn. 15.

Appellant also cites as prosecutorial misconduct the prosecution's remark, made in its opening statement of the penalty phase and essentially repeated in closing, that "there can be no mitigating factors which outweigh the aggravating circumstances of the murder of a police officer in order to escape apprehension for another crime or the murder of a police officer while doing his duty." Here again, appellant has waived all but plain error.

We reject appellant's contention that the prosecution's statement constituted misconduct. As noted above, prosecutors are permitted to urge the merits of their cause and, in so doing, are permitted to argue that defense mitigation evidence is entitled to no weight. *Wilson,* 74 Ohio St.3d at 399, 659 N.E.2d at 309. It is difficult for prosecutors to argue vigorously for the death penalty without making what might arguably be statements of personal opinion. A prosecutor may offer his or her opinion if it is based on the evidence presented at trial. *State v. Stephens* (1970), 24 Ohio St.2d 76, 83, 53 O.O.2d 182, 186, 263 N.E.2d 773, 777. Finally, we note that any potential error here was cured by the trial court's instruction to the jury that statements and arguments made by the attorneys are not evidence. *State v. Palmer* (1997), 80 Ohio St.3d 543, 562, 687 N.E.2d 685, 702.

Last, appellant argues that the prosecution engaged in misconduct when, during the cross-examination of a witness, it implied that appellant had been involved in another homicide. During the cross-examination of a witness named Charles See, the prosecution elicited information that an acquaintance of the appellant, Emasio Hull, had been involved in an altercation with the appellant and had, during this altercation, hit the appellant in the head with a hammer. The prosecution then asked the witness whether he was aware of the fact that, after this incident, Hull was murdered. Defense counsel objected. The trial court sustained the objection and informed the jury to disregard the question because Hull's murder had no relevancy to the matter before it.

In light of the trial court's sustaining of defense counsel's objection and the trial court's subsequent instruction to the jury, we find no prejudicial error in the prosecution's question. Juries are presumed to follow trial court instructions. *Raglin,* 83 Ohio St.3d at 264, 699 N.E.2d at 492.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his thirteenth proposition of law, appellant argues that he received ineffective assistance of counsel during the pretrial, trial, and penalty phases. To win a reversal on the basis of ineffective assistance of counsel, the defendant must show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.*, paragraph three of the syllabus.

### *Ineffective Assistance of Counsel at the Pretrial and Trial Phases*

Appellant raises several alleged instances of ineffective assistance during the pretrial and trial phases. First, appellant contends that he received ineffective assistance of counsel when, during voir dire, his counsel failed to move that Juror McCollum be excused for cause on the basis of that juror's alleged bias. Above, we noted that Juror McCollum indicated to the trial court that, if selected as a juror, he would follow the law and would assume appellant's innocence. We have already held that the trial court did not err in declining to excuse this juror *sua sponte*. Thus, defense counsel could quite reasonably have concluded that a motion to dismiss Juror McCollum for cause would not have been successful. "Counsel need not raise meritless issues or even all arguably meritorious issues." *Taylor*, 78 Ohio St.3d at 31, 676 N.E.2d at 97. The record reveals that defense counsel instead used one of its peremptory challenges to exclude Juror McCollum. These kinds of tactical decisions fall "well within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699, 104 S.Ct. at 2070, 80 L.Ed.2d at 701.

As a second instance of ineffective assistance, appellant points to defense counsel's failure to object to the admission of evidence regarding Officer Glover's medical treatment and the efforts to save his life. We have already thoroughly discussed this issue and have concluded that this evidence was relevant and admissible as evidence illustrating the nature and circumstances of the crime. Again, counsel need not raise meritless issues or even all arguably meritorious issues for that matter. *Taylor*, 78 Ohio St.3d at 31, 676 N.E.2d at 97. Accordingly, defense counsel's failure to object did not constitute deficient performance.

Third, appellant challenges defense counsel's failure to move for merger of the second and third death penalty specifications until after the guilt phase of the trial had concluded, at which time defense counsel moved for, and was granted, merger. These death penalty specifications constituted duplicative aggravating circumstances under R.C. 2929.04(A)(6) and did in fact have to be merged. See *Jenkins*, 15 Ohio St.3d 164, 199–200, 15 OBR 311, 341–342, 473 N.E.2d 264, 296–297. However, we do not believe that defense counsel acted unreasonably in waiting until the penalty phase to move for merger. Certainly, this tactical decision caused no prejudice to the appellant.

Finally, appellant argues that he received ineffective assistance when defense counsel failed to move for dismissal of the R.C. 2929.04(A)(3) death penalty specification. We have held that the prosecution proved each element of this specification by proof beyond a reasonable doubt. Accordingly, there was no basis for moving to dismiss this specification and, hence, no ineffective assistance of counsel. *Taylor*, 78 Ohio St.3d at 31, 676 N.E.2d at 97 (counsel need not raise meritless objections).

### Ineffective Assistance of Counsel at the Penalty Phase

Appellant raises four alleged instances of ineffective assistance at the penalty phase of his trial. First, appellant challenges defense counsel's failure to object when the trial court instructed the jurors that they had to determine what evidence was relevant. We have already examined this instruction and concluded that the instruction could reasonably have been interpreted by jurors to mean that they were to consider only evidence deemed relevant by the trial court. Certainly, defense counsel could reasonably have attached the same meaning to the trial court's statement and declined to object for this reason. In any event, we have already determined that this instruction did not prejudice the outcome of the case.

Second, appellant challenges defense counsel's failure to object when the prosecution informed jurors that no amount of mitigation could outweigh the killing of a police officer. We have already held that these statements from the prosecution were not improper. The statements did not warrant an objection.

Third, appellant argues that defense counsel should have objected to allegedly "irrelevant" exhibits, photos, and medical evidence relating to Officer's Glover's wounds and treatment. We have concluded that much of this evidence was relevant and admissible because it illustrated the nature and circumstances of the crime. Moreover, given the serious nature of the aggravating circumstances, the admission of some or all of this evidence could not have affected the outcome of the trial.

Finally, appellant argues that he was provided ineffective assistance when defense counsel failed to emphasize to the jury specific facts from mitigation exhibits submitted to the jury. Specifically, appellant challenges defense counsel's failure to point out that, just before appellant was born, a physician had referred to appellant's mother as noncommunicative and in need of guidance. Appellant also challenges defense counsel's failure to point out to the jury that appellant's mother had committed suicide by intentional drug overdose. The record indicates that appellant's defense counsel had presented an abundance of evidence regarding appellant's mother, including her inability to form an attachment with appellant and the effect her suicide had upon him. The subtle tactical choices that appellant now challenges were decisions that lay within the realm of professionally reasonable judgment. We further find that defense counsel's failure to highlight to the jury specific items of mitigation contained in exhibits submitted to it could not have affected the outcome of the trial, especially in light of the weight and gravity of the aggravating circumstances.

We have reviewed each of appellant's alleged instances of ineffective assistance of counsel and conclude that appellant received constitutionally adequate representation at each phase of his trial. Accordingly, we reject appellant's thirteenth proposition of law.

## CONSTITUTIONALITY OF OHIO'S DEATH PENALTY LAW

In his fifteenth and final proposition of law, appellant raises several constitutional challenges to Ohio's death penalty law, which we summarily reject. Appellant's arguments have been rejected in numerous previous decisions issued by this court. See, *e.g., State v. Hill* (1996), 75 Ohio St.3d 195, 201, 661 N.E.2d 1068, 1076; *State v. Coleman* (1989), 45 Ohio St.3d 298, 308–309, 544 N.E.2d 622, 633–634.

## INDEPENDENT SENTENCE EVALUATION

Having considered appellant's propositions of law, we must now independently review the death sentence for appropriateness and proportionality. We find beyond a reasonable doubt that the balance of aggravating circumstances against mitigating factors in this case weighs in favor of a death sentence.

Much of appellant's mitigation evidence focused upon his relationship with his mother. In mitigation, appellant presented testimony that he was born to an eighteen-year-old mother who foisted the bulk of his care onto others. Appellant's primary caregiver was his foster grandmother, Theresa Lyons. Appellant

had no relationship with his father. Nor did appellant have any positive male role models in his life. Appellant's natural mother was a drug user. Her legal and substance abuse problems caused her to drift in and out of her son's life. When appellant was only six years old, his mother was incarcerated for theft. When appellant was thirteen, his mother died from a drug overdose, an apparent suicide. The testimony of several witnesses suggests that the death of his mother was a turning point in appellant's life. Appellant became involved with gangs and began to run afoul of the law. He was frequently truant from school until he was expelled. Testimonial evidence in the record suggests that appellant suffers from antisocial personality and attachment disorders, which may have created in appellant an inability to empathize and a tendency to violate the rights of others.

Appellant's mitigation evidence suggests that violence and death have characterized much of appellant's life. Both his grandmother and great-grandmother, for example, died from gunshot wounds. Like his mother, a cousin, who was a close friend to appellant, committed suicide. One of his own daughters died young. An uncle is in prison serving time for murder. At the age of sixteen, appellant was severely beaten and robbed by someone he had considered to be a friend.

Nothing in the nature and circumstances of the offense mitigates the appellant's crime. A mere week before he killed Officer Glover, appellant professed to his cousin that he would kill any officer who attempted to arrest him. To this end, appellant armed himself with a .38 caliber revolver and loaded it with hollow point bullets, a particularly deadly form of ammunition. Appellant displayed chilling mercilessness in his killing of Officer Glover, firing the fatal shots at point-blank range. He then fled the scene, stopping only to kick the wounded and defenseless officer. Appellant surrendered only when all available means of escape had been exhausted.

Upon review of the evidence in mitigation, it appears that appellant had a chaotic and troubled childhood. We find that appellant's background and personality disorders are entitled to some weight in mitigation. See *State v. Johnson* (2000), 88 Ohio St.3d 95, 123, 723 N.E.2d 1054, 1078. At the time he committed this offense, appellant was twenty-one years old. Appellant's relative youth is entitled to some, but minimal, weight in mitigation. *Id.* Nothing in the nature and circumstances of the crime is mitigating.

We determine that the R.C. 2929.04(A)(3) and (A)(6) aggravating circumstances outweigh the mitigating factors presented. In order to escape apprehension for his prior aggravated robbery offense, appellant knowingly killed a police officer who was, at the time, engaged in his professional duties. After considerable

thought and review, we conclude that these aggravating circumstances outweigh the mitigating evidence beyond a reasonable doubt.

We have undertaken a comparison of the sentence imposed in this case to those in which we have previously upheld the sentence of death and have found that the appellant's death sentence is neither excessive nor disproportionate to the sentence imposed in similar cases. See, *e.g.*, *White*, 82 Ohio St.3d 16, 693 N.E.2d 772; *State v. Glenn* (1986), 28 Ohio St.3d 451, 28 OBR 501, 504 N.E.2d 701.

For the foregoing reasons, we affirm the judgment of the trial court and uphold the sentence of death.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., concur separately.

---

**COOK, J., concurring.** Like the majority, I would affirm appellant's convictions and death sentence. I respectfully disagree, however, with the majority's conclusion that the aggravating circumstance in R.C. 2929.04(A)(3) requires the state to prove beyond a reasonable doubt that the defendant committed the offense for which he sought to avoid apprehension.

I

The (A)(3) specification requires the state to prove, beyond a reasonable doubt, that the capital offense was committed for a particular *purpose*—"*for the purpose of* escaping detection, apprehension, trial, or punishment for another offense committed by the offender." (Emphasis added.) R.C. 2929.04(A)(3). The (A)(3) specification enhances the potential penalty for aggravated murder based on the offender's *mens rea*—the offender's purpose—not the *actus reus* of a collateral offense. Cf. *Apprendi v. New Jersey* (2000), 530 U.S. 466, ——, 120 S.Ct. 2348, 2364, 147 L.Ed.2d 435, 457 (finding that, under a New Jersey hate crime statute, "it is precisely a particular criminal *mens rea* that the * * * enhancement statute seeks to target").

A comparison between the (A)(3) specification and our state's kidnapping statute illustrates the distinction between a core *mens rea* requirement (an *element*) and a collateral offense. The kidnapping statute provides:

"No person * * * shall remove another from the place where the other person is found * * * for any of the following *purposes:*

"* * *

"(4) To engage in sexual activity * * * with the victim against the victim's will." (Emphasis added.) R.C. 2905.01(A)(4).

Like the (A)(3) specification, the kidnapping statute requires the state to prove, beyond a reasonable doubt, that the offender acted with a specific *purpose*. In *State v. Powell* (1990), 49 Ohio St.3d 255, 552 N.E.2d 191 (superseded by constitutional amendment on other grounds as noted in *State v. Smith* [1997], 80 Ohio St.3d 89, 103, 684 N.E.2d 668, 684), the appellant claimed that his conviction for kidnapping under this section was improper because there was insufficient evidence to prove that sexual activity actually occurred. This court unanimously rejected Powell's contention, deciding that the kidnapping statute "requires only that the restraint or removal occur *for the purpose of non-consensual sexual activity—not that sexual activity actually take place*." (Emphasis added.) *Id.,* 49 Ohio St.3d at 262, 552 N.E.2d at 199. The same logic should apply to this court's analysis of the (A)(3) specification.

The (A)(3) specification has appeared in over forty cases decided by this court since 1976.[4] Like the majority, Jones cites none of them in his brief as support for his contention that commission of the collateral offense must be proved beyond a reasonable doubt. Both the majority and Jones simply cite the general rules from *Winship* and *Jackson* that the state has the burden to prove *all the elements* of any charge beyond a reasonable doubt. See *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368; *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Because I do not agree with the majority that the modifying phrase "committed by the offender" constitutes an *element* of the (A)(3) specification, I do not find the constitutional rules of *Winship* and *Jackson* offended by Jones's conviction of the specification absent proof that he committed the underlying offense.

In the present case, the state introduced evidence that Jones had outstanding felony warrants. The state also showed that a week before the killing, Jones told his cousin that he was "facing a lot of time for robbing Isaac Coleman," and that he "was going to shoot at the police if they ever tried to arrest him." This is exactly what occurred. When Officer Glover told Jones, "[Y]ou know why I'm here, * * * I'm just doing my job," Jones fled, eventually shooting and then viciously kicking Officer Glover. The state proved beyond a reasonable doubt that Jones fled and killed Officer Glover *to escape apprehension for another offense*. It was unnecessary for the state to prove beyond a reasonable doubt

---

4. See, *e.g., State v. Filiaggi* (1999), 86 Ohio St.3d 230, 714 N.E.2d 867; *State v. Chinn* (1999), 85 Ohio St.3d 548, 709 N.E.2d 1166; *State v. Lawson* (1992), 64 Ohio St.3d 336, 595 N.E.2d 902; *State v. Hancock* (1976), 48 Ohio St.2d 147, 2 O.O.3d 333, 358 N.E.2d 273.

that Jones actually committed the other offense, and it is therefore unnecessary for this court to decide, as the majority does, that the state met this burden of proof by introducing the single "admission" Jones made to his cousin.[5] As one annotation has put it, "[p]roof that a law enforcement officer was killed in the course of an investigation or arrest has been uniformly held sufficient to establish that the murder was committed for the purpose of avoiding or preventing a lawful arrest." Annotation (1988), 64 A.L.R.4th 755, 763.

## II

I would also resolve Jones's tenth proposition of law somewhat differently from the majority. In his tenth proposition, Jones contends that the trial court erred when it failed to merge the R.C. 2929.04(A)(3) and (A)(6) death penalty specifications. Death specifications are duplicative and should be merged when they arise from the same act or indivisible course of conduct. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. Merger is not required when the specifications are not duplicative or arise from divisible courses of conduct. See *State v. Robb* (2000), 88 Ohio St.3d 59, 85, 723 N.E.2d 1019, 1047 (declining to merge [A][4], [A][5], and [A][7] specifications). A trial court's failure to merge duplicative aggravating circumstances does not always result in reversible error. *State v. Garner* (1995), 74 Ohio St.3d 49, 53–55, 656 N.E.2d 623, 630–631, citing *Jenkins*, at paragraph five of the syllabus. Rather, the reviewing court must determine "whether the jury's penalty-phase consideration of those duplicative aggravating circumstances affected its verdict,

---

5. The majority decides that the state proved beyond a reasonable doubt that Jones actually committed the prior offense of aggravated robbery. The majority states that Jones's "admission" to his cousin that he was "facing a lot of time for robbing Isaac Coleman" was all the evidence that the state needed to introduce in order to prove beyond a reasonable doubt that Jones actually committed the aggravated robbery. Under the majority's analysis, if the state charges someone with *aggravated robbery*, the state may discharge its burden of proof in the case solely by introducing the testimony of a witness (not necessarily an eyewitness), who merely testifies that the accused said that he was "facing a lot of time" for *robbery* —an offense that differs significantly from *aggravated robbery*. Compare R.C. 2911.01 and R.C. 2911.02. Though I deem it unnecessary to resolve this issue in the first place, see *supra*, I feel compelled to disagree with the majority's conclusion that Jones's statement to his cousin sufficed, in and of itself, to prove beyond a reasonable doubt that Jones committed aggravated robbery. In this state, to convict someone of aggravated robbery, the state must prove, *inter alia*, either (1) that the offender had a deadly weapon or dangerous ordnance on or about his person, R.C. 2911.01(A)(1) and (2), or (2) that the offender inflicted or attempted to inflict serious physical harm. R.C. 2911.01(A)(3). Jones's "admission" to his cousin did not contain any information tending to prove these elements of aggravated robbery. Accordingly, even if I agreed with the majority's threshold determination that the defendant's commission of the prior offense constitutes an essential element of the (A)(3) specification, which I do not, I could not join its analysis of the sufficiency of the evidence.

and [must] independently determine whether the merged aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt." *Id.* at 53, 656 N.E.2d at 630.

Here, Jones was convicted of three capital specifications—one (A)(3) specification and two (A)(6) specifications. The trial court *did* merge the two (A)(6) specifications, and thus presented one (A)(3) specification and one (A)(6) specification to the jury in the penalty phase. The majority decides that merger of the (A)(3) and (A)(6) specifications was not required, but I find it unnecessary to resolve this issue here. Assuming, *arguendo,* that specifications (A)(3) and (A)(6) arose from an indivisible course of conduct, and that the trial court should have merged them, I would nevertheless conclude that the failure to do so "did not influence the jury to recommend death [where] it would otherwise have recommended life." *Garner,* 74 Ohio St.3d at 54, 656 N.E.2d at 631. As in *Garner,* merger of the specifications "would not have significantly changed the nature of the evidence the jury was statutorily required to consider in making its recommendation as to a possible sentence of death." *Id.* Accordingly, I would overrule appellant's tenth proposition of law without deciding the merger question.

## III

Assessing appellant's thirteenth proposition of law, the majority concludes that because the state proved each element of the (A)(3) specification beyond a reasonable doubt, "there was no basis for moving to dismiss this specification." I agree that Jones's claim of ineffective assistance of counsel must fail, but not because I share the majority's view that the state proved each element of the (A)(3) specification beyond a reasonable doubt. See fn. 5, *supra.* Because the trial court was not required to dismiss the (A)(3) specification, counsel's failure to request dismissal cannot be the basis for a claim of ineffective assistance of counsel.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing concurring opinion.

## APPENDIX

"Proposition of Law No. I: A capital defendant's right to a reliable death sentence under the Eighth Amendment as well as his right to a fair and impartial jury under the Due Process and Equal Protection Clauses of the Fourteenth Amendment are violated when the defendant is prohibited, or unduly restricted from asking questions during voir dire about the prospective jurors' ability to consider mitigating factors. U.S. Const. Amends. VIII and XIV.

"Proposition of Law No. II: The death sentence must be vacated where mitigating factors are not outweighed by the aggravating circumstances.

"Proposition of Law No. III: Retrial is required where errors that occurred during voir dire denied a capital appellant a fair and impartial jury. U.S. Const. Amends. VI, VIII and XIV.

"Proposition of Law No. IV: Denial of a change of venue based upon racial imbalance of the jury deprived the appellant of a fair trial. U.S. Const. Amends. VI and XIV.

"Proposition of Law No. V: When a trial court denies a capital defendant his counsel of choice, the trial court deprives that defendant of his rights to counsel and to due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and §§ 10 and 16, Article I of the Ohio Constitution.

"Proposition of Law No. VI: The admission of irrelevant evidence about the extraordinary efforts made to save the victim's life denied appellant due process and constituted plain error at both phases of this capital trial. U.S. Const. Amends. VIII and XIV.

"Proposition of Law No. VII: Where multiple evidentiary errors in the trial phase prejudice the defendant, the conviction must be reversed. U.S. Const. Amend. XIV.

"Proposition of Law No. VIII: The state must present evidence of a deliberate plan to kill in order to sustain a conviction for a killing with prior calculation and design under Ohio Rev.Code Ann. § 2903.01(A). The state must also present evidence on all essential elements of the charged specifications. U.S. Const. Amends. VI, VIII and XIV.

"Proposition of Law No. IX: A defendant's conviction must be reversed when multiple errors in the trial phase instructions denied him a fair trial and due process of law. U.S. Const. Amend. XIV.

"Proposition of Law No. X: Where it is alleged that a defendant killed a police officer to prevent the defendant's arrest for another offense, the § 2929.04(A)(3) and (A)(6) aggravating circumstances are duplicative and must be merged because they arise from the same act or indivisible course of conduct. U.S. Const. Amends. VIII and XIV.

"Proposition of Law No. XI: Misconduct by the prosecutor at Odraye Jones's capital trial denied him due process of law and undermines confidence in the trial and the sentencing verdict. U.S. Const. [Amends.] VIII and XIV.

"Proposition of Law No. XII: Where penalty phase instructions allow the jury to decide what evidence is admissible concerning the aggravating circumstances

and where the instructions do not conform to Ohio and federal law, reversal is required. U.S. Const. Amend[s]. VIII and XIV.

"Proposition of Law No. XIII: Counsel's performance will be deemed ineffective if it falls below an objective standard of reasonable representation and prejudice arises therefrom. U.S. Const. Amends. VI and XIV.

"Proposition of Law No. XIV: Resentencing is required where the trial court fails to accord weight to (B)(7) mitigating evidence because it does not qualify as (B)(3) and the court weighs the (A)(6) as a super aggravating circumstance. U.S. Const. Amends. VIII and XIV.

"Proposition of Law No. XV: Ohio's death penalty law is unconstitutional. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev.Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 (Anderson 1996), do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Odraye Jones."

*Thomas L. Sartini*, Ashtabula County Prosecuting Attorney, and *Ariana E. Tarighati*, Chief Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, State Public Defender, and *Stephen A. Ferrell*, Assistant Public Defender; and *Robert A. Dixon*, for appellant.

COLUMBUS BAR ASSOCIATION *v*. WINKFIELD.

[Cite as *Columbus Bar Assn. v. Winkfield* (2001), 91 Ohio St.3d 364.]

(No. 00–1138—Submitted November 28, 2000—Decided April 11, 2001.)

---

***Per Curiam.*** In February 1997, the family of Frederick E. Lowery retained respondent Lawrence Edward Winkfield of Columbus, Ohio, Attorney Registration No. 0034254, and paid him a retainer of $7,000 to investigate and, if possible, obtain postconviction relief for Lowery. Lowery was convicted in 1993 of aggravated robbery. Respondent told the family that he would charge $150 an hour against the retainer and discussed with them the options of supershock probation and a motion to reconsider. Respondent did not deposit the retainer in a separate trust account.

The potential remedies respondent discussed with the family were unavailable because of the nature of Lowery's conviction.. Although respondent obtained and examined the relevant court files, spoke with Lowery on the phone, and unsuccessfully attempted to honor his commitment to visit Lowery in prison, he filed no court papers on Lowery's behalf.

In July 1997, the family informed respondent that his employment was terminated and demanded an accounting of his services and a return of the unused portion of the retainer. In October 1998, before he had received a complaint from the relator, respondent turned over the $7,000 to his former counsel. After deducting $1,200 for legal fees due respondent and $600 for his own legal fees to respondent, his former counsel transmitted $5,200 to the Lowery family in May 1999.

In March 1999, the Office of Disciplinary Counsel of the Supreme Court requested that respondent reply to a grievance filed by Michael Studebaker.[1] Despite this notice and two subsequent requests, respondent did not file a written reply to the inquiry.

On October 19, 1999, relator, the Columbus Bar Association, filed an amended complaint charging among other things that respondent's conduct violated DR 1–102(A)(6) (engaging in conduct that adversely reflects upon the lawyer's fitness to practice law), 6–101(A)(3) (neglecting an entrusted legal matter), 7–101(A)(1) (failing to seek the lawful objectives of a client), 7–101(A)(2) (failing to carry out a contract of employment for professional services), 9–102(A)(2) (failing to deposit client funds in an account in which no funds of the lawyer are deposited except those that potentially belong to the lawyer), 9–102(B)(3) (failing to render appropriate accounts to the client), and 9–102(B)(4) (failing to promptly deliver client funds to the client upon request). It also charged that respondent violated Gov.Bar R. V(4)(G) (failing to cooperate in a disciplinary investigation).

Respondent answered, and the matter was referred to a panel of the Board of Commissioners on Grievances and Discipline ("board").

The panel found the facts as stated and concluded that respondent had violated the Disciplinary Rules and the Rules for the Government of the Bar as charged. Taking into account letters of support regarding respondent's value to his church, community, and the legal profession, as well as reports from a psychiatrist and psychologist verifying that respondent had a history of depression, and noting that this court had previously disciplined respondent in *Columbus Bar Assn. v. Winkfield* (1996), 75 Ohio St.3d 527, 664 N.E.2d 902, the panel recommended that respondent be suspended indefinitely from the practice of law. It also recommended that respondent be required to pay the Lowery family $1,800 with interest at ten percent from February 1997, and pay them ten percent interest on $5,200 from February 1, 1997 to May 31, 1999. The board adopted the findings, conclusions, and recommendation of the panel.

We have reviewed the record and adopt the findings and conclusions of the board. However, we believe that the facts in this case do not warrant an indefinite suspension. Seven months of the delay in returning the funds to the Lowerys can be attributed to the former attorney for respondent, who held the funds from October 1998 until May 1999 before paying them out. During those final seven months, respondent had assumed not only that his former counsel had paid out the funds but also that he had provided the Lowerys with an accounting. Prior to May 1999, his former counsel did neither.

---

1. The substance of Studebaker's grievance was not brought before the panel.

We hereby suspend respondent from the practice of law for two years with the final year of that suspension stayed provided that during the first year respondent pays or makes arrangement (1) to pay the Lowery family $1,800 with interest at ten percent from February 1997 to the date of repayment, and (2) to pay the Lowery family ten percent interest on $5,200 from February 1, 1997 to May 31, 1999.

*Judgment accordingly.*

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and COOK, J., dissent.

---

COOK, J., dissenting. I would adopt the board's recommendation to indefinitely suspend respondent.

To justify its departure from the board's recommendation, the majority notes that "[s]even months of the delay in returning the funds to the Lowerys can be attributed to the former attorney for respondent." I do not disagree with this finding, but it does not account for respondent's sole control of the funds for nearly *fourteen months* after receiving the Lowerys' termination notice and demand for accounting. Nor does it account for the panel's other troubling findings: that "the testimony of the Respondent was glib and not sincerely an expression of regret about his obvious mistreatment of the Lowery family," and that there is "[no] basis to believe that the Respondent would change his way of mistreating clients in the future."

In *Columbus Bar Assn. v. Winkfield* (1996), 75 Ohio St.3d 527, 530, 664 N.E.2d 902, 905, I dissented from this court's decision to impose a lesser sanction against respondent than the board had recommended in that case and noted respondent's "unwillingness to acknowledge his wrongdoing." Given respondent's prior discipline and what the panel and board described as "deceitful" misconduct in the instant matters, I must again respectfully dissent.

MOYER, C.J., concurs in the foregoing dissenting opinion.

---

*Terry K. Sherman, Susan C. Walker* and *Bruce A. Campbell,* for relator.

*Lane, Alton & Horst, L.L.C.,* and *Alvin E. Mathews, Jr.; Hofelich & Hofelich* and *James A. Hofelich,* for respondent.

Columbus Bar Association *v.* Plymale.

[Cite as *Columbus Bar Assn. v. Plymale* (2001), 91 Ohio St.3d 367.]

(No. 00–1551—Submitted December 13, 2000—Decided April 11, 2001.)

Douglas, J. In a complaint filed September 23, 1999, relator, Columbus Bar Association, charged respondent, Ronald E. Plymale of Columbus, Ohio, Attorney Registration No. 0033032, with two counts of professional misconduct. Each count charged respondent with a violation of DR 3–102(A) (sharing a legal fee with a nonlawyer). Respondent is the principal of the law firm Plymale & Associates ("the firm").

Count One arose out of circumstances related to the firm's representation of claimants against manufacturers of silicone breast implants. The firm represented over five hundred clients with such claims and became a participant in the global structured settlement that was implemented for these cases. The deadline for submitting claims for payment under the structured settlement was September 16, 1994.

To assist in preparing the claim forms by the September 16 deadline, respondent hired Scott Cohen, an attorney who was attending medical school. Respondent entered into a written employment contract with Cohen on May 23, 1994, in which respondent agreed to pay Cohen, upon timely completion of the claims forms, a bonus of $5,000 as well as one and one-half percent of the legal fees collected by the firm from those claims that Cohen was directly involved in preparing.

During this same period, Marilou Stafford, a registered nurse, was an employee of the firm. Stafford was involved in preparing the breast implant claim forms. Stafford was not an attorney.

Near the end of July 1994, Cohen abruptly left respondent's employment. Cohen's resignation put respondent in a dilemma because many of the claim forms were not yet completed and the September 16 deadline was approaching.

The record before the court reflects that there is a dispute of fact relating to the negotiations regarding Stafford's compensation for her work on the breast implant claims. Stafford testified that she and respondent had entered into an oral agreement sometime between December 1993 and February 1994. The terms of this alleged oral agreement, according to Stafford, required respondent to pay Stafford a bonus of $5,000 as well as four percent of the gross legal fees generated by those breast implant claims that Stafford assisted in preparing. Stafford testified that respondent told her that she was to be paid a higher percentage of the legal fees than Cohen because she was a full-time employee and Cohen was a temporary employee.

Stafford further testified that when respondent later reduced the oral agreement to writing, at Stafford's urging, it was not an accurate reflection of their earlier oral agreement in that the written agreement provided that Stafford would be paid only one and one-half percent of the legal fees. Stafford testified that respondent later offered to share two percent of the legal fees.

Respondent, on the other hand, although admitting that he offered to share legal fees with Stafford, testified that he did not extend the offer to pay Stafford a percentage of the fees until after Cohen quit working for the firm. According to respondent, because of Cohen's resignation, respondent was concerned that the claim forms would not be completed before the deadline. Respondent therefore immediately approached Stafford and asked whether she wanted to take over some of Cohen's responsibilities in exchange for the "same bonus" that he had offered Cohen, i.e., one and one-half percent of the legal fees. Respondent testified that Stafford did not verbally accept this offer, but he assumed by her actions that she accepted.

Respondent further testified that when he later put the agreement in writing, at Stafford's request, he realized that she had not accepted his offer to share one and one-half percent of the legal fees and instead expected to share four percent of the legal fees. In an attempt to compromise with Stafford, respondent then offered to give Stafford two percent of the legal fees. Stafford never accepted this offer.

Respondent also testified that during the negotiations with Stafford regarding the percentage of legal fees to be shared, he became aware that it was unethical to share legal fees with a nonlawyer. Respondent and Stafford both testified that before a written agreement was reached, respondent told Stafford that sharing legal fees with her would be improper and he would have to find another way to compensate her for her hard work on the breast implant litigation. Both also testified that respondent never paid Stafford a percentage of the legal fees collected in relation to the breast implant claims.

When Stafford's employment with the firm ended in 1995, she entered into a written release and settlement agreement with respondent. The agreement required that respondent pay Stafford $20,000 in exchange for Stafford's release of any and all claims she might have against respondent for any reason, including those arising out of the employment relationship. Respondent subsequently paid Stafford $20,000 pursuant to this agreement. Notwithstanding the release and settlement agreement, Stafford subsequently filed a lawsuit against respondent. That lawsuit was settled out of court.

Count Two of the complaint against respondent involved a year-end bonus policy established by respondent in 1994. The policy was contained in the firm's 1994 office manual and provided:

"For the immediate future, commencing in calendar year 1994 and until terminated by management, each secretary and paralegal assigned to a particular lawyer will be paid .004 [.4%] of the gross fees earned by that lawyer during the fiscal year, provided that the lawyer has met or exceeded his pre-established financial goal for the year."

In accordance with this policy, at the end of 1994, a bonus of $3,946.98 was shared between three legal assistants. The bonus policy was abolished after the 1994 calendar year.

A panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court heard the evidence. With regard to Count One, the panel determined that respondent had entered into an agreement to share legal fees with Stafford, a nonlawyer, and that this agreement constituted a sharing of legal fees in violation of DR 3–102(A). However, with regard to Count Two (year-end bonus policy), the panel found no violation of DR 3–102(A).

Accordingly, the panel recommended that respondent be publicly reprimanded for misconduct related to Count One and that Count Two be dismissed. The board adopted the findings of fact, conclusions of law, and recommendations of the panel.

Although the Board of Commissioners on Grievances and Discipline makes recommendations to this court in disciplinary proceedings, this court renders the final determination of facts and conclusions of law. *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, at paragraph one of the syllabus. After a thorough review of the record in this case, we conclude that relator has failed to meet its burden of proving, by clear and convincing evidence, that respondent's actions with respect to Count One constituted a violation of DR 3–102(A). Therefore, we decline to follow the board's recommendation with regard to Count One.

DR 3–102(A) provides that "[a] lawyer or law firm shall not share legal fees with a non-lawyer * * *." The board found that respondent did not *actually* share legal fees with Stafford; however, it found that respondent and Stafford had *entered into an agreement* to share legal fees and the board determined that entering into such an agreement was in and of itself a violation of DR 3–102(A). On the contrary, we find that there was never an agreement between respondent and Stafford to share legal fees. Moreover, we hold that entering into an agreement to share legal fees with a nonlawyer does not in and of itself constitute a violation of DR 3–102(A).

Initially, we note that there was never an executed written agreement between respondent and Stafford to share legal fees. The board found, however, that respondent and Stafford had an oral agreement to share fees. We believe that the board's finding that there was an oral agreement to share legal fees was based, at least in part, upon an erroneous finding by the board regarding Stafford's testimony. Specifically, the board found that "Stafford testified she entered into a verbal contract [with respondent] *after Mr. Cohen left* [respondent's employment], which would pay her four percent (4%) of all the attorney's fees generated by the breast implant claims she administered." (Emphasis added.) There is no evidence in the record before this court to support this finding by the board.

Our review of the transcript of the hearing before the panel reveals that Stafford repeatedly testified that "[s]ometime between December of 1993 and February of 1994" she entered into an oral agreement with respondent to share four percent of the attorney fees. She further testified that Cohen left the firm in July or August 1994. Therefore, contrary to the board's finding, Stafford did *not* testify that she had entered into an oral agreement with respondent to share fees *after* Cohen left respondent's employment.

Although this discrepancy between the board's finding and Stafford's actual testimony may at first appear inconsequential, we believe that this inaccurate finding was a significant factor in the board's conclusion that an oral agreement had been formed. In this regard, it appears that in determining whether Stafford's testimony that respondent agreed to pay her four percent of the legal fees was credible, the board took into account that Cohen had left the firm and respondent was in "dire need" of Stafford's assistance in getting the remaining claim forms completed. According to Stafford's testimony, however, the alleged oral agreement was entered into at least seven months before the deadline for filing the breast implant claims and at least five months before Cohen left the firm. Thus, the board erred in considering the firm's loss of Cohen as a factor in determining the credibility of Stafford's testimony regarding the alleged oral agreement.

After reviewing Stafford's testimony regarding the alleged oral agreement, we conclude that it lacks credibility. Specifically, Stafford testified that respondent agreed to pay her four percent of the legal fees and Cohen, a licensed attorney attending medical school, only one and one-half percent of the legal fees simply because she was a permanent employee and Cohen was a temporary employee. We find this explanation for the alleged discrepancy in payment arrangements implausible.

In contrast, we find respondent's testimony regarding his negotiations with Stafford to be credible and supported by exhibits in the record. Respondent testified that he offered to share legal fees with Stafford immediately after Cohen left because of the looming deadline for filing claims and his need for Stafford to take over some of Cohen's responsibilities. Respondent further testified that in exchange for taking over some of Cohen's work, he *offered* to pay Stafford the same bonus that he had offered Cohen, *i.e.*, one and one-half percent of the legal fees. This offer was reduced to writing and the unsigned document was admitted during the hearing as Joint Exhibit 3. When Stafford refused this offer, respondent offered to pay her two percent of the legal fees. This written, unsigned offer was admitted during the hearing as Joint Exhibit 2. Thereafter, respondent revoked all offers to share fees with Stafford after realizing that it was inappropriate to share legal fees with a nonlawyer. In short, there was never a meeting of the minds of the principals regarding an essential term, *i.e.*, the percentage of legal fees to be shared. See, *e.g.*, *Noroski v. Fallet* (1982), 2 Ohio St.3d 77, 79, 2 OBR 632, 634, 442 N.E.2d 1302, 1304. Thus, construing the evidence in its entirety, we conclude that respondent and Stafford did not enter into an agreement to share legal fees.

Moreover, even if respondent had entered an agreement to share legal fees with Stafford, such an agreement in and of itself is not sufficient to establish a violation of DR 3–102(A). DR 3–102(A) explicitly prohibits a *sharing* of legal fees; it does not prohibit an *agreement* to share legal fees.

Having said that, we hasten to add that we are not suggesting that it is proper to enter into such an agreement. Canon 9 of the Code of Professional Responsibility provides that lawyers should avoid even the appearance of impropriety. EC 9–6. Thus, offering to share a fee with a nonlawyer and/or entering an agreement to share a fee with a nonlawyer should be avoided.

For all of the foregoing reasons, we find that, with respect to Count One, relator has failed to prove, by clear and convincing evidence, that respondent violated DR 3–102(A). Accordingly, we decline to accept the recommendation of the board with regard to Count One and hereby dismiss that charge against respondent.

Furthermore, we adopt the board's findings of fact, conclusions of law, and recommendation relating to Count Two (year-end bonus policy). Accordingly, Count Two is hereby dismissed.

*Cause dismissed.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

LUNDBERG STRATTON, J., concurs in part.

MOYER, C.J., and COOK, J., concur in part and dissent in part.

---

**LUNDBERG STRATTON, J., concurring in part.** I concur in the dismissal of this action because respondent clearly recognized that it was inappropriate to share legal fees with a nonlawyer and took steps to stop performance of the agreement.

The majority holds that although DR 3–102(A) explicitly prohibits a *sharing* of legal fees, it does not prohibit an *agreement* to share legal fees. I disagree and would hold that, assuming there was such an agreement, making the *agreement* to share legal fees is just as improper under DR 3–102(A) as performing the agreement. To hold otherwise is simply not logical. However, since respondent became aware of the prohibition against sharing fees and withdrew his offer or agreement, I believe that we have the discretion to find that no sanctions are warranted.

Moreover, I find it unnecessary for the majority even to reach the issue of whether entering into an agreement to share legal fees with a nonlawyer violates DR 3–102(A), because the majority finds that respondent and Stafford never actually entered into an agreement to share legal fees.

Accordingly, I respectfully decline to join the majority's holding that entering into an agreement to share legal fees with a nonlawyer does not in and of itself constitute a violation of DR 3–102(A), but concur in the dismissal of the cause.

---

**COOK, J., concurring in part and dissenting in part.** I would adopt the recommendations of the board as to both counts and would publicly reprimand respondent for the violation of DR 3–102(A) set forth in Count One of the complaint.

MOYER, C.J., concurs in the foregoing opinion.

*Bruce A. Campbell,* Bar Counsel for Columbus Bar Association; *Louis A. Jacobs* and *Jerry Silverstein,* for relator.

*Mitchell, Allen, Catalano & Boda Co., L.P.A.,* and *William C. Mann; Kegler, Brown, Hill & Ritter* and *Geoffrey Stern,* for respondent.

CINCINNATI BAR ASSOCIATION *v.* JONES.

[Cite as *Cincinnati Bar Assn. v. Jones* (2001), 91 Ohio St.3d 373.]

(No. 00–1889—Submitted December 13, 2000—Decided April 11, 2001.)

*Per Curiam.* On November 24, 1999, relator, Cincinnati Bar Association, filed a complaint charging respondent, Timothy V. Jones of Cincinnati, Ohio, Attorney Registration No. 0063968, with six counts of attorney misconduct, all relating to the neglect of legal matters entrusted to him by various clients. Respondent answered and the matter was heard by a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board").

Based on testimony and stipulations received at a hearing, the panel found that respondent had filed a divorce proceeding for Portia Gill after she paid him $750 but then failed to keep in contact with Gill. Months after her case was filed, Gill discovered that respondent had left the practice of law. Respondent failed to withdraw from Gill's case as required by local court rules and failed to return her personal papers. The panel also found that in August 1998, Shirley Barber hired respondent to represent her in a divorce action and paid him $325. After filing appropriate pleadings and appearing before a magistrate on Barber's behalf,

respondent told Barber a week before the scheduled hearing that he was taking a job in Dayton and could not appear with her. Respondent failed to follow the local court rules in withdrawing from Barber's case, which was subsequently dismissed for lack of prosecution.

The panel also made findings in four other matters. Jacqueline Evans paid respondent a retainer of $1,500 and a filing fee of $190 in June 1998 to represent her in a contract dispute. Respondent filed the case, but unknown to the Evans, he dismissed it in April 1999. When she inquired at his former office, Evans was told by a secretary that respondent no longer worked in the office and had left no forwarding address.

In July 1998, David Sprawl paid respondent a $450 filing fee and agreed to pay respondent a one-third contingency fee to handle Sprawl's personal injury claim. Respondent did not file the case and a year later informed Sprawl that he should find another lawyer because the statute of limitations was running. Respondent did not return the $450 to Sprawl.

In February 1997, Frederick Smith paid respondent $450 to be used as a filing fee for representation in a workers' compensation claim. Respondent filed the case, voluntarily dismissed it, and then filed it again. The total filing fees were $283. When respondent failed to appear in court, Smith terminated respondent's employment and requested a return of his file and any remaining funds. Respondent did not respond, failed to return any unused fees to Smith, and failed to withdraw properly from his representation.

In March 1997, Paula M. Dillard paid respondent $200 in filing fees and agreed to pay respondent a $500 retainer to represent her in a divorce action. In March 1999, Dillard paid respondent $300 of the agreed retainer. Respondent failed to file the case, and when Dillard inquired at his former office, she was told that respondent "was no longer there" and had left "no forwarding address." Respondent also failed to respond to relator's inquiry regarding Dillard's grievance.

The panel concluded that in each of these six matters, respondent's conduct violated DR 6–101(A)(3) (neglecting an entrusted legal matter) and 7–101(A)(2) (failing to carry out a contract for professional services). It concluded that in the Gill, Barber, and Smith cases, his conduct violated DR 2–110(A)(1) (failing to obtain permission from a tribunal to withdraw from a case, where such permission is required), and that in the Gill, Barber, Sprawl, and Dillard cases his conduct violated DR 2–110(A)(2) (withdrawing from employment without taking reasonable steps to avoid prejudicing a client). Also, in the Gill, Barber, and Dillard matters, the panel concluded that respondent's conduct violated DR 2–110(A)(3) (failing to promptly return any unearned advance fee upon withdrawal from a case).

The panel further concluded that in the Gill, Smith, and Dillard cases, respondent violated DR 9–102(B)(4) (failing to return promptly, when requested, property which the client is entitled to receive) and in the Evans matter he violated 7–101(A)(3) (prejudicing or damaging a client during the course of a professional relationship). Finally the panel concluded that in the Dillard case respondent violated the Gov.Bar R. V(4)(G) requirement that an attorney assist in a disciplinary investigation.

The panel found little evidence in mitigation and recommended that the respondent be suspended from the practice of law for two years, with one year stayed upon condition that respondent refund the money owed to his clients and undergo monitoring during the stay as directed by the relator. It recommended that the stay be revoked if during the two-year term of his suspension a complaint is filed against respondent that passes probable cause review by the board. The board adopted the findings, conclusions, and recommendations of the panel.

We adopt the findings and conclusions of the board except the conclusion that respondent violated DR 2–110(A)(3) in the Gill and Barber matters. Relator's allegations that respondent failed to return the unearned portion of his fee in those matters was denied in the answer, and neither the stipulations nor the testimony introduced at the hearing support this conclusion.

We adopt the recommendations of the board. Respondent is hereby suspended from the practice of law for two years, with one year stayed provided that respondent refund the money owed to his clients and undergo monitoring during the stay as directed by the relator. If respondent fails to satisfy these conditions, or if during the two-year term of his suspension a complaint is filed against respondent that passes probable cause review by the board, the stay shall be revoked.

Costs are taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

PFEIFER, COOK and LUNDBERG STRATTON, JJ., dissent.

---

COOK, J., dissenting. I respectfully dissent. Although I agree that a two-year suspension is the appropriate sanction, I would decline to stay any part of that suspension.

PFEIFER and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

Robert J. Gehring and Jean M. Geoppinger, for relator.

John H. Burlew, for respondent.

THE STATE OF OHIO, APPELLEE, v. JONES, APPELLANT.

[Cite as State v. Jones (2001), 91 Ohio St.3d 376.]

(No. 99–986—Submitted January 30, 2001—Decided April 25, 2001.)

Per Curiam. Appellant, Elwood H. Jones, was convicted of aggravated murder with death specifications, aggravated burglary, and aggravated robbery. He was sentenced to death. Upon appeal, the court of appeals affirmed the convictions and sentence. State v. Jones (Aug. 28, 1998), Hamilton App. No. C–970043, unreported, 1998 WL 542713. On direct appeal as of right, we also affirmed his convictions and sentence on December 27, 2000. State v. Jones (2000), 90 Ohio St.3d 403, 739 N.E.2d 300.

On November 27, 1998, appellant filed an application for reopening with the court of appeals pursuant to App.R. 26(B) and State v. Murnahan (1992), 63 Ohio St.3d 60, 584 N.E.2d 1204, alleging ineffective assistance of appellate counsel in his direct appeal.

In denying appellant's application for reopening, the court of appeals relied on State v. McNeill (1998), 83 Ohio St.3d 457, 459, 700 N.E.2d 613, 615, and held that he had not properly alleged ineffective assistance of appellate counsel. The court further held that if it were to assume that appellant had properly raised ineffective assistance of appellate counsel claims, he failed to state " 'the manner in which the deficiency [in appellate counsel's performance] prejudicially affected the outcome of the appeal,' which is required by App.R. 26(B)(2)(d)." (Bracketed material sic.) The cause is now before the court upon an appeal as of right.

We agree with the court of appeals that appellant failed to state a claim of ineffective assistance of appellate counsel. The two-pronged analysis found in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, is the appropriate standard to assess whether Jones has raised a "genuine issue" as to the ineffectiveness of appellate counsel in his request to reopen under App.R. 26(B)(5). See *State v. Spivey* (1998), 84 Ohio St.3d 24, 25, 701 N.E.2d 696, 697.

To justify reopening his appeal, Jones "bears the burden of establishing that there was a 'genuine issue' as to whether he has a 'colorable claim' of ineffective assistance of counsel on appeal." *Id.*

We have reviewed appellant's six propositions of law alleging deficient performance by appellate counsel. In none of the six instances has Jones raised "a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal" before the court of appeals, as required under App.R. 26(B)(5).

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Michael K. Allen*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Gregory W. Meyers*, Senior Assistant Public Defender, and *Jennifer P. Hite*, Assistant Public Defender, for appellant.

THE STATE EX REL. U–BRAND CORPORATION, INC.,
APPELLANT, *v.* WOOD ET AL., APPELLEES.

[Cite as *State ex rel. U–Brand Corp., Inc.
v. Wood* (2001), 91 Ohio St.3d 377.]

(No. 00–1136—Submitted February 27, 2001—Decided April 25, 2001.)

The judgment of the court of appeals is affirmed consistent with the opinion of the court of appeals.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Scott, Scriven & Wahoff, L.L.P., Timothy E. Cowans* and *Richard Goldberg,* for appellant.

*Stephen E. Mindzak; Donaldson Law Offices, L.P.A.,* and *John D. Donaldson,* for appellee Lloyd Wood.

*Betty D. Montgomery,* Attorney General, and *Dennis L. Hufstader,* Assistant Attorney General, for appellee Industrial Commission of Ohio.

THE STATE EX REL. KING, APPELLANT, *v.* INDUSTRIAL
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. King v. Indus. Comm.*
(2001), 91 Ohio St.3d 378.]

(No. 00–1212—Submitted February 27, 2001—Decided April 25, 2001.)

The judgment of the court of appeals is affirmed consistent with the opinion of the court of appeals.

MOYER, C.J., PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

RESNICK and F.E. SWEENEY, JJ., dissent and would reverse the judgment of the court of appeals.

DOUGLAS, J., dissents.

THE STATE EX REL. ASARCO, INC., APPELLEE AND CROSS-
APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO
ET AL., APPELLANTS AND CROSS-APPELLEES.

[Cite as *State ex rel. Asarco, Inc. v. Indus.
Comm.* (2001), 91 Ohio St.3d 379.]

(No. 00–1252—Submitted February 27, 2001—Decided April 25, 2001.)

The judgment of the court of appeals is reversed and the order of the Industrial Commission is reinstated.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

———————

*Schottenstein, Zox & Dunn Co., L.P.A.,* and *Patrick A. Devine,* for appellee and cross-appellant.

*Betty D. Montgomery,* Attorney General, and *Jacob Dobres,* Assistant Attorney General, for appellant and cross-appellee Industrial Commission of Ohio.

*Philip J. Fulton & Associates* and *William A. Thorman III,* for appellant and cross-appellee Kenneth A. Poland.

ROLF ET AL. *v.* TRI STATE MOTOR TRANSIT COMPANY ET AL.

[Cite as *Rolf v. Tri State Motor Transit
Co.* (2001), 91 Ohio St.3d 380.]

(No. 00–1329—Submitted January 31, 2001—Decided April 25, 2001.)

FRANCIS E. SWEENEY, SR., J. This matter is before us as a certified question of state law from the United States District Court, Northern District, Western Division. In its certification order the federal district court states:

"Kenneth Martin, father of plaintiffs Bonnie L. Rolf and David Martin (both emancipated adults living apart from their parents), was seriously and permanently injured on October 8, 1996, in Allen County, Ohio, when his vehicle was struck from behind by a semi-trailer truck being operated by Dallas K. Pelcher, in the course and scope of his employment for the defendant Tri State Motor Transit Company. As a result of the accident, Kenneth Martin's cognitive functions and ability to control basic bodily functions have been seriously impaired. For the rest of his life he will require convalescent care and continuing medical treatment.

"* * *

"Plaintiffs Bonnie L. Rolf and David Martin filed the instant proceeding in the certifying Court on November 8, 1999. Plaintiffs seek to recover damages for the loss of consortium that they have suffered as a result of the injuries to their father."

Pursuant to S.Ct.Prac.R. XVIII, the federal district court has certified the following question of law to this court for our determination:

"Can emancipated adult children maintain a claim under Ohio law for the loss of consortium caused by injuries to a parent?"

For the reasons that follow, we answer the certified question in the affirmative.

This court has previously recognized a minor child's cause of action for loss of parental consortium. *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 617 N.E.2d 1052, paragraph two of the syllabus. We are now asked to extend the holding of *Gallimore* to allow adult children to pursue a similar cause of action for parental loss of consortium.

The rationale advanced in favor of recognizing a minor child's loss-of-parental-consortium claim in *Gallimore* was taken, in large part, from Justice Resnick's dissenting opinion in *High v. Howard* (1992), 64 Ohio St.3d 82, 86–96, 592 N.E.2d 818, 821–827, a decision that *Gallimore* overruled.[1] These policy arguments can be summarized as follows: (1) since a minor child can recover similar damages under the wrongful death statute, R.C. 2125.02, when a parent dies, he or she should also be allowed to recover for loss of parental consortium when a parent is injured but not killed; (2) since Ohio already recognizes spousal and filial consortium claims, it should likewise recognize a minor's loss-of-parental-consortium claim, since the claimant's loss consists of many of the same elements in each type of consortium claim, including the loss of love, affection, and companionship. Therefore, to deny a loss-of-parental-consortium claim would relegate the parent-child relationship to second-class status behind spousal consortium claims or filial consortium claims; and (3) a minor child should be allowed to recover for loss of parental consortium because the child suffers a very real and debilitating loss when a parent is injured and deserves to be compensated for that loss.

Petitioners argue that these policy reasons apply to adult children as well as minors. Consequently, they maintain that they should not be denied their right to recovery simply because they are adults. Respondent Tri State, however, rejects these arguments and instead contends that there are more persuasive reasons for refusing to extend loss-of-parental-consortium claims to adult, emancipated children.[2]

---

1. The primary issue in *Gallimore* was whether Ohio should recognize a cause of action for filial consortium, *i.e.*, an action brought by parents to recover damages arising out of their minor child's injuries. 67 Ohio St.3d 244, 246, 617 N.E.2d 1052, 1053–1054. In recognizing such an action, *id.* at paragraph one of the syllabus, we then addressed the corresponding cause of action for a minor child's claim of loss of parental consortium. Since the only issue before this court concerns loss of parental consortium, we are limiting our discussion to that issue.

2. Respondent contends that the fact that an adult child may recover damages under the wrongful death statute is irrelevant and does not create an anomaly. However, in *Gallimore,* we found this incongruity to be a relevant consideration in recognizing a parent's claim of loss of consortium of a

The primary reason why respondent urges us to limit the holding of *Gallimore* to minor children is its belief that while minors suffer a compensable loss when a parent is injured, this loss is compensable only because minors are dependent upon a parent for their care and emotional guidance. By contrast, respondent maintains that the loss is so much less severe with adult children because they are no longer reliant upon a parent for financial or emotional support. Based upon this inherent difference, respondent concludes that we should not extend loss-of-parental-consortium claims to adult children.

We reject the reasoning advanced by respondent. The fact that an adult child's relationship with a parent differs from that of a minor child does not provide us with justification for refusing to recognize an adult child's loss-of-parental-consortium claim. In *Gallimore*, we held that consortium may include services, society, companionship, comfort, love, guidance, and solace. *Id.*, 67 Ohio St.3d 244, 617 N.E.2d 1052. The essence of a parental-consortium claim is that a child is compensated for a harm done or for losses suffered as a result of injury to the parent and to the parent-child relationship. Mogill, And Justice For Some: Assessing the Need to Recognize the Child's Action for Loss of Parental Consortium (1992), 24 Ariz.St.L.J. 1321, 1324–1325. Certainly, both minor and adult children whose parent has been injured have suffered a loss that fits within this definition. In that regard, we agree with the sentiment expressed by the court in *Nelson v. Four Seasons Nursing Ctr.* (Okla.App.1996), 934 P.2d 1104, 1105, when it stated:

"There is simply no good reason to afford the personal right of companionship and the parent-child relationship less protection in cases involving adult children who seek to recover for injury to the parent-child relationship. In cases where the parent-child relationship is destroyed or nearly destroyed by the tort of the defendant, the affected children, both minors and adults alike, should be allowed to maintain a cause of action for loss of parental consortium."

Furthermore, while it is true that minor children are more dependent upon their parents to satisfy their basic needs, as noted by one law review article, many adults actually renew their reliance on their parents when they reach middle age. Hammar, Breaking the Age Barrier in Alaska: Including Adult Children in Loss of Filial Consortium Actions (1995), 12 Alaska L.Rev. 73, 85. Therefore, just as minor children look to their parents for emotional support, those adult children who continue to enjoy a close relationship with their parents still depend upon their parents for affection, advice, and guidance as they become older. Consequently, when a parent is seriously injured, the adult child suffers

---

minor child. *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 249–250, 617 N.E.2d 1052, 1056. We adhere to that rationale in this case as well.

an injury in being deprived of that parent's love and guidance. Therefore, regardless of the age of the child, the loss to the parent-child relationship is real and should not be minimized.

Therefore, we find that it is irrational to deny recovery for loss of parental consortium simply because the child has reached the age of majority. The fact that a child turns eighteen does not erase the need for parental guidance. As one commentator so aptly notes: "The parent-child relationship does not end when the child becomes eighteen. It endures throughout life and can be characterized by love, care and affection for the duration." *Id.*, 12 Alaska L.Rev. at 83. In that regard, it is important to recognize that " '[e]ven adult and married children have the right to expect the benefit of good parental advice and guidance.' " *Audubon–Exira Ready Mix, Inc. v. Illinois Cent. Gulf RR. Co.* (Iowa 1983), 335 N.W.2d 148, 150, quoting *Schmitt v. Jenkins Truck Lines, Inc.* (Iowa 1969), 170 N.W.2d 632, 665.

The Arizona court in *Howard Frank, M.D., P.C. v. Maricopa Cty. Superior Court* (1986), 150 Ariz. 228, 232, 722 P.2d 955, 959, reiterated this rationale when recognizing a filial consortium claim (brought by parents to recover for injuries sustained by their adult child), when it stated:

"Surely nature recoils from the suggestion that the society, companionship and love which compose filial consortium automatically fade upon emancipation[,] while common sense and experience teach that the elements of consortium can never be commanded against a child's will at any age. The filial relationship, admittedly intangible, is ill-defined by reference to the ages of the parties and ill-served by arbitrary age distinctions. Some filial relationships will be blessed with mutual caring and love from infancy through death while others will always be bereft of those qualities. Therefore, to suggest as a matter of law that compensable consortium begins at birth and ends at age eighteen is illogical and inconsistent with common sense and experience."

This rationale applies with equal force in the context of an adult emancipated child's cause of action for loss of parental consortium. The facts of this case demonstrate how great this loss is and why adult children deserve to be compensated. Here, the petitioners' father suffered a traumatic brain injury, is physically and mentally impaired, and will require custodial care for the remainder of his life. Petitioners have, for all practical purposes, lost the essence of the relationship they once enjoyed with their father. Because of his debilitating injuries, they can no longer enjoy life experiences with their father nor can they turn to him for advice, guidance, or emotional support. Certainly, these adult children deserve to be compensated for the tragic losses sustained just as minor children do.

In conclusion, we find no legitimate reason to limit recovery for loss of parental consortium to minor children. Consequently, we hold that adult emancipated children may recover for loss of parental consortium. As we have now recognized an emancipated adult child's loss-of-consortium claim, these individuals, who were previously denied compensation due to an artificial age barrier, may now seek the legal redress they are entitled to for the losses they have suffered.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment.

---

*Bashein & Bashein Co., L.P.A.,* and *W. Craig Bashein; Paul W. Flowers Co., L.P.A.,* and *Paul W. Flowers,* for petitioners.

*Shumaker, Loop & Kendrick, LLP,* and *William H. Heywood III,* for respondent.

*Calhoun, Kademenos & Heichel Co., L.P.A.,* and *Janet L. Phillips,* in support of petitioners for *amicus curiae,* Ohio Academy of Trial Lawyers.